CHRISTOPHER B. BOUTON v. ROBERT CAMERON *et al.*

and

JAMES G. WRIGHT v. SAME.

*Opinion filed October 26, 1903—Rehearing denied December 3, 1903.*

1. MORTGAGES—*assignee of trust deed takes subject to defenses.* An assignee of a trust deed takes it subject to all defenses which exist in favor of the grantor, and if he would protect himself he must make inquiry of the grantor as to such defenses.*

2. SAME—*money decree in foreclosure can only be rendered for a deficiency.* A money decree can be rendered in foreclosure proceedings only for the balance remaining unpaid after a sale of the property has failed to produce the amount found to be due.

- 3. SUBROGATION—*a volunteer cannot invoke doctrine of subrogation.* A volunteer who loans money which is applied towards the discharge of a lien is not entitled to be subrogated to the rights of the lienholder.

4. BILLS AND NOTES—*only assignment which will cut off equities is by endorsement.* The only assignment of a note which will cut off equities of the maker is by endorsement, in conformity with the statute.

5. APPEALS AND ERRORS—*chancellor's findings of fact not lightly disturbed.* Findings of fact by the chancellor who heard the witnesses testify in open court will not be disturbed on review unless clearly against the evidence.

*Bouton v. Cameron,* 99 Ill. App. 600, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. HENRY B. WILLIS, Judge, presiding.

February 4, 1895, appellant Christopher Bouton began suit in the circuit court of Cook county to foreclose a trust deed executed by appellees. Various other parties supposed to have some interest in the premises were made defendants, and among them was appellant James G. Wright, who is the only one of the other defendants it is necessary for us to consider in this appeal. Wright

*See Laws of 1901, p. 248; also 4 Starr & Curtis, p. 891.

answered, and also filed a cross-bill setting up the rights
he claimed to have. The trial court decided the cause
in favor of appellant Bouton and the cross-complainant
Wright as to the property mentioned in the trust deed in
the name of Robert Cameron, but dismissed the bill and
cross-bill as to the property in the name of Mrs. Cameron.
From that decree a writ of error was sued out from the
Appellate Court by Robert Cameron. When the cause
came before the Appellate Court the decree of the cir-
cuit court was reversed except as to the dismissal of the
bills with reference to Mrs. Cameron, in which particu-
lar the decree was neither reversed nor affirmed, on the
ground that Mrs. Cameron was not a party to the writ of
error, either by service or appearance, and the cause was
remanded to the circuit court. The decision of the Ap-
pellate Court is reported in 72 Ill. App. 264. The cause
being re-instated in the circuit court and trial had, a de-
cree was entered denying all relief to appellant Wright
and denying relief to appellant Bouton except foreclos-
ure to the amount of $100 and interest, amounting in all
to $193.39, and $15.47 solicitor's fees. From that decree
separate appeals were taken by the present appellants
to the Appellate Court, where, for the purpose of review
there, the appeals were consolidated. The Appellate
Court affirmed the decree of the lower court, and from
the judgments entered in that court appeals were prayed
by each of the appellants to this court, where the cases
will again be considered together.

In order to make plain the views we entertain of the
matters thus brought before us, it will be necessary to
set out at some length the facts, as we understand them,
that are presented by the record and evidence transmit-
ted to this court.

In the summer of 1892 appellee Robert Cameron be-
came desirous of purchasing certain property on Barry
avenue, in the city of Chicago. The title to this prop-
erty was in two minors by the name of Bruschke, subject

to a mortgage held by one William Troost. For the purpose of accomplishing the purchase Cameron applied to Arthur C. Gehr, a real estate agent in Chicago. The father of this man Gehr had long been the confidential friend and adviser of the Camerons, the appellees, and since the death of the elder Gehr, some years previous, Arthur C. retained the same relation with appellees heretofore held by the father, transacting business for them and keeping various of their papers in his office. Gehr informed Cameron that he could not purchase the property through the administrator, and that the best way to obtain title would be by means of a foreclosure of the Troost mortgage. This mortgage debt amounted, in round numbers, to about $5000, including costs, etc., but it was arranged that Cameron was to pay $10,000 for the property. Thus the minors would realize about $5000. Gehr informed Cameron that he (Gehr) would attend the foreclosure sale and bid in the property for him, (Cameron,) and that Cameron would not need to be present at the sale. Gehr did attend the sale and bought the property, but in his own name. At the same time Gehr entered into a written contract with the guardian of the minors, which recited that Gehr had attended the said sale and bought in the property for $10,000 on the condition that he would pay the sum found to be due on the mortgage debt by the master, together with costs, etc., amounting to $4918.43, to be paid in cash on or before the day of expiration of the time for redemption if said property should not be redeemed, and that he would pay the balance of said $10,000, being $5081.57, into the circuit court, provided that certain allowances be made for interest, taxes, etc. Said sale occurred on March 2, 1893, and the next day a certificate of sale was issued to Gehr, who, upon receipt of the same about two weeks later, assigned and sold the same to James G. Wright. On May 2, 1893, Gehr assigned to Cameron the contract made with the guardian, by writing in the following words:

"For value received I hereby sell, assign, transfer and set over to Robert Cameron, of Chicago, Illinois, all my right, title and interest in and to the within contract of sale, and for myself, heirs, executors, administrators and assigns, I agree that upon delivery of the within mentioned master's deed to sell and convey said land to said Robert Cameron, who has delivered to me his note for $11,000, secured by trust deed upon land in Cook county, Illinois.          ARTHUR C. GEHR.   [Seal.]"

Cameron claims that he was informed by Gehr that he (Gehr) had advanced the money at the master's sale and that he held the certificate, and that he did not learn until about fourteen months afterwards that Gehr had sold the certificate to Wright.

On April 1, 1893, about a month after Gehr had bought the Barry avenue property at the foreclosure sale and about two weeks after he had sold the certificate to Wright and received the money therefor, when, it appears from the evidence, Cameron believed that Gehr had purchased for him (Cameron) and had in his possession the master's certificate of sale, appellees went to the office of Gehr and executed the deed of trust sought to be foreclosed, to secure Cameron's note for $11,000, payable in one year to his order and endorsed by him in blank. Cameron and his wife both testified that at the time the deed of trust was signed Gehr assured them that it did not contain the piece of property owned by Mrs. Cameron, but only that owned by appellee Robert Cameron. It is admitted that Cameron cannot read, and both Mrs. and Mr. Cameron deny that the instrument was read to them at the time of signing it. The purpose of the execution of this note and trust deed is stated thus by Gehr: "About early in April, 1893, after I made this contract with Mr. Kriewitz, (the guardian of the minors,) I suggested to Mr. Cameron that in case of his death that he should give me security for my being obligated to carry out this contract with Mr. Kriewitz for property that I was not buying for myself and did not want. He

thought that was a proper thing to do." In regard to it Robert Cameron testified: "The $11,000 note was given to secure Gehr against loss in case I might die, so as this property would not be left on his hands, and it was made out $11,000 in place of $10,000. There was $1000 to be spent on the house after I got possession of the property." In the writing of May 3, hereinafter referred to and set out, the purpose is still further declared, as follows: "The said note was deposited with you (Gehr) to secure you from loss by reason of your having signed a contract for the purchase of the property on Barry avenue for my benefit."

April 20, 1893, Cameron and wife borrowed of Gehr $1000, for the purpose, as they state, of buying furniture. Of this loan $900 was subsequently paid back at different intervals, the last payment of $50 being made May 7, 1894.

On May 3, 1893, Gehr obtained from Cameron and wife the following writing, referred to above:

"CHICAGO, *May 3, 1893.*

"*Arthur C. Gehr, 114 Dearborn Street:*

"You are hereby authorized to borrow such an amount upon my note for $11,000, dated April 1, 1893, secured by a deed of trust, as you may require. The said note was deposited with you to secure you from loss by reason of your having signed a contract for the purchase of the property on Barry avenue for my benefit. I have received the sum of $1000 on account of said note, and in giving you my consent to raising additional amounts on said note I rely upon you to see that such amounts are paid promptly, though legally I authorize you to use said note for your benefit and accommodation at its face value, at your discretion.        ROBERT CAMERON,
                                        SARAH F. CAMERON."

The Camerons testified with reference to the purpose and intention of this paper, as follows:

Mr. Cameron testified: "Gehr told me that he wanted to know if I would do him a little favor that morning, and I said I would if I could, and he said he would like to use that note and the mortgage of mine for $1500 for ninety days, and just about that time Mrs. Cameron came

in, and I told her what Gehr wanted,—wanted to use the note and mortgage for $1500 for ninety days,—and I says: 'You know Mr. Gehr better than I do; if you say it is all right I am satisfied,' and Mr. Gehr spoke up and he says, 'It would be quite an accommodation for me, Mrs. Cameron, if Mr. Cameron would let me use that note for ninety days for $1500,' and she says, 'Well, Mr. Gehr, we owe you $1000 now, and that would be only $500 more than what we owe you, and I certainly think that you are good for $500.' 'Well,' I says, 'You are the doctor, and if you say so I am satisfied.' And then he spoke something about that there were some taxes and interest, or both, on the Lake View property of Walker's and his, and then he told Mrs. Cameron, after that was all talked about a little, that he had brought the contract up, and showed it to her; he had brought the contract up for the Barry avenue property; that he had signed with the guardian, and it was nice property, and no trouble about it but what we would get it. Then he said to me that he would like to have it in writing, to show that he was authorized to use this note for $1500 for ninety days, and I said 'All right,' and he asked Mrs. Cameron if she would get him pen and ink and some paper, and she went and got him the pen and ink and paper, and after he had wrote out what had been written on the paper he asked me to sign it, and I signed it, and after I had signed the paper two or three minutes, he said, 'Well, Mrs. Cameron, I guess it would be better for you to sign it too,' and so Mrs. Cameron signed it. I don't believe Mrs. Cameron read that paper. I didn't; I couldn't if I tried to. Nobody else was present at that time besides myself and Mrs. Cameron. Gehr didn't read that paper to me nor to Mrs. Cameron in my presence."

Mrs. Cameron testified: "When Gehr came there I guess Mr. Cameron let him in, and I came in a few minutes, and spoke to him, and asked him how he was, and such as that. Then I went out again of the room in a

few minutes, and I came in again, and Mr. Cameron spoke
to me and told me what Gehr wanted; that he wanted
the loan of $1500,—used those words. That was in Gehr's
presence, and Gehr told,—they both told me at the same
time,—they both told me about it. Gehr said he would
like to use those papers for $1500, and of course I didn't
know that he could use them for any more but the $1500.
Mr. Cameron said, 'Would it be all right?' and I said,
'Yes, we owe him $1000 now, and that surely you could
trust him for $500 more.' So we told him yes,—that he
could do it. And then he asked me for paper, pen and
ink, and I brought it, and he wrote this paper and Mr.
Cameron signed it. I didn't read the paper. There was
nothing said about the reading of it. · Gehr didn't read
the paper to me. Gehr told me that the paper was for
getting,—so that he could get the $1500. Gehr stayed
there, it might be twenty minutes or half an hour; might
be half an hour. Something further' was said by Gehr
in reference to the Barry avenue property. He talked a
little about that, because that was what Mr. Cameron and
him was talking about when I went in; and he brought
up some kind of paper,—contract or something,—I don't
exactly remember what it was. * * * Gehr said that
was the contract for the Barry avenue property, and that
we were going to get it, and such things as that. * * *
In reference to this $1500, something was said about the
time by Gehr. It was for ninety days." Gehr stated that
he read the paper to both Cameron and his wife, and
stated that he wished to use part of the money on the
Lake View property, in which he had an interest.

On May 20, 1893, Gehr borrowed $6000 of a man named
Straus, for two months, putting up the Cameron note and
trust deed as collateral security. On July 19 he re-paid
$2000 of this loan, but was unable to meet the balance
when due. Thereupon Straus became suspicious and re-
fused to extend the time of payment unless Gehr would
bring about a meeting between him and Cameron that

he might satisfy himself as to the collateral and Gehr's right to so use the Cameron note and trust deed. Thereupon Gehr sent for Cameron to come to the office of attorney Wertheimer, where Gehr and Straus awaited him, and at that meeting the following writing was procured from Cameron:

"CHICAGO, *July 27, 1893.*

"I, the undersigned, Robert Cameron, do hereby declare that I did, on the first day of April, 1893, execute one promissory note, payable one year after date, to the order of myself and by me endorsed, in the principal sum of $11,000, with interest thereon at the rate of six per cent per annum, payable half-yearly, on the first day of October and of April in each year, without grace, at the office of Arthur C. Gehr & Co., in Chicago, interest evidenced by two coupon notes of even date; that said sum of $11,000 was paid me by Arthur C. Gehr & Co., and that said Arthur C. Gehr & Co., upon the execution thereof, became the owners of said note and coupons, and had full authority to negotiate or otherwise dispose of the same for their own use and behoof. Said note and interest aforementioned is secured by trust deed executed by me on real estate in Cook county, which said trust deed bears document number 1,843,-226, recorded April 5, 1893, in book 4289 of records, page 36.

ROBERT CAMERON.

Signed in presence of B. J. Wertheimer, P. W. Straus."

There seems to be no question but what the procurement of this paper was solely for the purpose of enabling Gehr to effect an extension of his loan from Straus. As to what took place there, and the understanding of Cameron with regard to it, there is conflict of evidence. Attorney Wertheimer testified that he explained the purpose of the meeting to Cameron, and that his conclusion was that he understood what he was doing, but he would not be certain whether he read the paper to Cameron or Cameron read it for himself, but he was confident that Cameron knew its contents. Straus testified that the matter was explained to Cameron; that Wertheimer explained to Cameron the purpose of the meeting was that Straus, as a business man, wanted to have proper information about the note and trust deed, etc. He then

further said: "He (Cameron) spoke to me regarding it. I told him it was all right. He did not ask me what it was, or anything of the sort. The paper had already been read, and I told him it was an acknowledgment by him that I had a right to use this note, the same as the other acknowledgment that I had before." Cameron testified about the meeting, the parties, etc.; that Straus asked him if Gehr had his note for $11,000, which he replied he had; that he was asked if Gehr was authorized to borrow money on it, etc., and further: "Mr. Wertheimer handed me a paper about the time that conversation was through. He asked me to read it and he would like to have me sign it. Gehr was sitting on the window. * * * I took the paper in my hand and walked over where Gehr was, and he got up off the window and I asked him what this paper meant. He said that it was the same as my wife and I had signed at the house; that this was the people he was getting the money from, and that they wanted to see the maker of the note and have him sign that paper. I signed the paper." He further testified that the paper was not read to him; that nothing was said about Gehr having paid him $11,000 or about Gehr owning the paper; that he was there about five minutes; that no one told him that Gehr had already borrowed money on the note and trust deed; that he had no conversation with Wertheimer beyond a mere introduction; that he made no inquiry about the loan because he supposed it was in regard to the $1500 which he had given Gehr permission to borrow.

Upon the execution of this paper of July 27 Straus extended the time of payment, and Gehr a short time thereafter re-paid the loan in full. In order to do this, however, Gehr had to procure another loan, which he did from appellant Bouton on August 17, 1893, which loan was for $5000 for sixty days, and was on Gehr's note, with the Cameron note and trust deed as collateral. At this time Gehr was owing appellant Wright $2000 for

money which Wright had placed in Gehr's hands a short time before for another purpose but which Gehr had used for himself. He also owed Straus $3000, balance due on the Straus loan, having paid $1000 on said loan a short time previous. At the time of procuring the Bouton loan, so far as the evidence discloses, neither Bouton, nor his agent, Tod, who acted for Bouton in this matter, had ever seen the papers of May 3 and July 27. Gehr himself testified that the paper of May 3 was placed by him in his vault among a bundle of old papers shortly after the time of procuring it, and he never saw it again until some time in the summer of 1894. Gehr had been negotiating with Bouton, and his agent, Tod, for some time, first with a view of selling, then borrowing on the Cameron securities. The paper of July 27 was in the hands of Straus until after Gehr obtained the money from Bouton, which money it was necessary for him to get before he could secure the release of the trust deed and paper from Straus, and Tod turned this paper back to Gehr a few minutes after Gehr had given it to him.

On March 16, 1894, Gehr procured a loan from appellant Wright, evidenced by his judgment note of that date for $7700, to secure payment of which he executed to Wright a paper purporting to be an assignment from him to Wright of certain other securities and also Gehr's interest in the Cameron note and trust deed. The language of the instrument, as to the note, is as follows: "Also all right, title and interest in and to a certain note for the sum of $11,000, made by Robert Cameron and dated April 1, 1893, secured by deed of trust recorded in the recorder's office of Cook county, Illinois, in book 4289 of records, at page 36, subject to an encumbrance or loan upon said note of the sum of five thousand dollars ($5000), for which said note is pledged with Walter Tod & Co. of Chicago, Illinois." Walter Tod & Co. is the name of appellant Bouton's firm. The purported assignment of the note and trust deed was necessarily by a separate instru-

ment, the note and trust deed being in Bouton's possession at the time of the transaction.

During the time of all these transactions between Cameron and Gehr, J. J. Wright, son of appellant Wright, was a clerk in Gehr's office and familiar with what was going on. Cameron said that in his visits to Gehr's office he saw Wright, Jr., much oftener than he did Gehr. Wright, Jr., took the acknowledgment of the trust deed from Cameron and his wife, and from his relation in the office we would suppose he knew the object for which it was given. That object is also stated in the paper of May 3, between which and the paper of July 27 there is an obvious discrepancy, the former stating the trust deed was to secure Gehr against loss, and the latter that Gehr had paid to Cameron $11,000, which Wright, Jr., must have known to be untrue. Wright, Jr., testified that he had received both of these papers before making the Wright loan to Gehr, as well, also, as the paper purporting to assign to Wright, Sr., Gehr's interest in the Cameron note and trust deed. This transaction with appellant Wright was about two weeks prior to the maturity of the Cameron note. Near the middle of April, about two weeks after the maturity of said note, Wright delivered to Tod, Bouton's agent, a writing to the effect that Gehr had assigned his equity in the Cameron note and trust deed to himself, (Wright,) subject to the claims of Bouton. After May 7, the date of the last payment by Cameron on the $1000 loan from Gehr, Cameron received a letter from Tod notifying him that his $11,000 note had not been paid, which appears to have been the first information that Cameron had that Gehr had hypothecated his note with Bouton. Cameron had several interviews with Tod and Bouton after this in regard to the matter, in one of which he explained to them how he came to give the note and trust deed to Gehr, and Bouton replied that it was too bad, but that he would have to be paid.

When the period of redemption under the foreclosure sale of the Barry avenue property had expired, Gehr was unable to carry out his contract for the purchase of the property. During all this time Cameron declares he supposed that the certificate of sale was being held by Gehr for him (Cameron). When Cameron became aware of the true status of affairs he was much incensed at Gehr, and to appease him Gehr assigned him some alleged securities, none of which appear to have been of any real value.

From the foregoing it will be seen that the position of appellants Bouton and Wright is, that the former is seeking here to foreclose the Cameron trust deed and note to recover the amount due him under the Gehr $5000 note, with interest, solicitor's fees, etc. Wright claims, by his cross-bill, that he is entitled to whatever is due on the Cameron note and trust deed, less the amount to which Bouton is entitled; that he has an equitable assignment of these securities to secure his loan of $7700.

In addition to what has already been said in reference to the findings of the decree rendered by the trial court as to the equities of the parties to this suit, the decree finds that Gehr fraudulently represented to the appellees that he had bought for them the Barry avenue property at the foreclosure sale and held in his possession a certificate of sale for said property, when, in fact, the said Gehr had transferred and assigned said certificate to James G. Wright, and that said certificate was paid for by money received from said Wright; that relying upon such fraudulent representations, which were material, appellee Robert Cameron executed his principal note for $11,000, and coupon notes, and the trust deed for certain property owned by him, and that the other appellee, Mrs. Cameron, being induced by said fraudulent representations, joined with her husband in the execution of said trust deed for the purpose of releasing her dower, and that such acts of appellees were for the purpose of

securing said Gehr harmless by reason of his supposed purchase. The decree further finds that said Gehr suffered no loss by reason of such pretended purchase; that about April 20, 1893, appellees borrowed of said Gehr $1000, of which appellees have re-paid $900, the last payment being on May 7, 1894; that about May 3, 1893, by fraudulent representations, said Gehr obtained permission from appellees to use said note and trust deed executed by them, as accommodation paper to the extent of $1500; that instead of only borrowing $1500 the said Gehr borrowed $6000 of one Straus, using said note and trust deed as security; that on August 17, 1893, Gehr borrowed from appellant Bouton $5000 upon his individual note for sixty days, with interest, and as collateral security to said note deposited with said Bouton the notes and trust deed hereinbefore mentioned, executed by the appellees; that said deposit was without the consent, authority or knowledge of appellees, or either of them; that said appellees had no knowledge of such fact until after May 7, 1894, and that no notice of such fact was received by them until after said date. The decree further finds that because of the loan of appellees from Gehr, said Gehr became entitled to a lien on the note and trust deed for the unpaid balance due him on account of said loan, which amount is, including interest, $193.39, and that by reason of Gehr's deposit of said securities with Bouton, said Bouton acquired the rights of Gehr and is entitled to a lien to the same extent that Gehr would have been. The decree further finds that about March 16, 1894, appellant Wright loaned Gehr $7700, and that Gehr assigned to Wright certain securities, among them being the attempted assignment heretofore mentioned with reference to the note and trust deed of appellees; that at the time of such transaction Gehr was not in possession of said note and trust deed, and that Gehr's act was without the consent, knowledge or authority of appellees, or either of them; that said appellant Wright failed to maintain

the material allegations of his cross-bill, and that the equities thereunder were with the appellees, and $15.47 solicitor's fees are allowed.

HECKMAN, ELSDON & SHAW, for appellant Bouton.

LEE & HAY, for appellant Wright.

MATZ, FISHER & BOYDEN, for appellees.

Mr. JUSTICE RICKS delivered the opinion of the court:

Appellant Bouton contends (1) that whatever might have been the original purpose of the execution of the $11,000 note and trust deed, the note became accommodation paper when the Camerons authorized Gehr to use them for his accommodation, and that the liability of appellees herein is to be measured by the rules of law applicable to accommodation paper; (2) that his loan to Gehr upon the $11,000 note and trust deed having gone (to the extent of $3000) to pay off the prior loan from Straus upon such note and trust deed, and the same having been thereby released, he is entitled to be subrogated to the rights of Straus to the extent of such payment; (3) that if the circuit court was right in only decreeing a foreclosure for the amount that was decreed, then, even in that case, he is entitled to a personal decree against Robert Cameron for the balance due on the $11,000.

Addressing ourselves to the first proposition, our opinion is that such contention is not well taken. There seems to be no question as to the well established rule of law that the assignee of a trust deed in the nature of a mortgage takes it subject to all defenses which the grantor could make against the grantee, and that if the assignee would protect himself he must make inquiry of the grantor whether he has any defenses that could be interposed against the grantee. (*Olds* v. *Cummings*, 31 Ill. 188; *McAuliffe* v. *Reuter*, 166 id. 491; *Buehler* v. *McCormick*,

169 id. 269.) Neither of the appellants is shown to have exercised any diligence whatever to protect himself upon the taking of these securities. Cameron lived in Chicago and was accessible to them, as shown by the fact that he received Tod's letter shortly after its date.

But appellants contend that the note of appellees was made accommodation paper by the writings of May 3 and July 27, and that the above rule does not apply, and the case of *Miller* v. *Larned,* 103 Ill. 562, is cited as sustaining this position. We think the evidence set out in the statement preceding this opinion makes it clear that the note in question was not intended or given as an accommodation note, and such was the finding of the chancellor in the trial court, but it was given as mere security to Gehr against loss by reason of his undertaking to purchase the property on Barry avenue for appellees. The original purpose of the note and trust deed is too clear for dispute. The chancellor found, and we think properly, that the writing of May 3 was for but a limited purpose,—that of enabling Gehr to borrow $1500 for ninety days,—and we do not see how that paper, given under the circumstances and for the purpose disclosed by the evidence, can now be construed as a general authority making appellees' note accommodation paper to its full face value, and how its protection can be invoked by persons who were never deceived by it and unaware of its existence. When the authority given under the papers of May 3 and July 27 was exhausted by the first loan obtained from Straus, the note and trust deed existed only for the purpose for which they were originally given, viz., security to Gehr against loss,— especially so far as all persons were concerned who were in no way misled or deceived by the papers of May 3 and July 27.

We do not accede to appellants' contention that the case of *Miller* v. *Larned, supra,* has application to the facts of this case and is controlling of it. In that case the

court said (p. 509): "A recognized definition of accommodation paper is, either a negotiable or non-negotiable bill or note made by one who puts his name thereto without consideration, with the intention of lending his credit to the party accommodated," and the court in that case held that the notes there in question were accommodation notes *ab initio*, and were so understood by the parties to them. There is no contention that Bouton, or his agent, Tod, ever saw or heard of the paper of May 3 before he made the loan to Gehr, and it is equally clear that neither of them saw the paper of July 27 until after they had given Gehr the money which they loaned him, and even then, when Tod did receive the paper of July 27, he almost immediately returned it to Gehr, thus indicating that even after he saw and possessed it he attached no, or but little, value thereto, and certainly it had no place in his calculations about the loan he had just made to Gehr. The decree of the circuit court finds, and we think on ample grounds, that Gehr used fraud and deceit in the procurement of both of these papers and used them in a manner that he had no authority to do. This element of fraud, alone, is sufficient to distinguish the present case from all of those cited by appellants as furnishing precedents for the decision of this case and as laying down rules for the government of accommodation paper.

It is next contended that appellant Bouton should be subrogated to the rights of Straus, inasmuch as $3000 of the money obtained from Bouton went to the re-payment of the Straus loan. We do not think the doctrine of subrogation can be applied to the facts in this case. Bouton was a mere volunteer. The money he paid to Gehr was not an advancement for the protection of any interest held by him, for at that time he possessed no interest. He was under no obligation whatever to loan his money to Gehr, and if he did so, it was a business transaction of such a nature as affords him no right to invoke the doctrine of subrogation. In Beach on Modern

Equity Jurisprudence (sec. 801) the author says: "But one who is only a volunteer cannot invoke the aid of subrogation, for such a person can establish no equity. He must have paid on request or as surety, or under some compulsion, made necessary by the adequate protection of his own right. * * * The loaning of money to discharge a lien does not subrogate the lender to the rights of the lienholder." The law of subrogation is declared in the following language in the American and English Encyclopedia of Law, (vol. 24, p. 281,) and the rule sustained by the citation of numerous cases from this and other States: "One who advances money to pay the debt of another, in the absence of agreement, express or implied, for subrogation, will not be entitled to succeed to the rights and remedies of the creditor so paid unless there is some obligation, interest or right, legal or equitable, on the part of such person in respect of the matter concerning which the advance is made, as otherwise he is a stranger, a volunteer, an intermeddler, to whom the equitable right of subrogation is never accorded."

It is next contended that appellant Bouton is entitled to a personal decree against Cameron for the amount of the $11,000, less the amount found to be due from him by the trial court. The court found that Gehr had no authority to pledge the note and trust deed as collateral security, and we are unable to see on what ground Bouton would, in equity, be entitled to such a decree. If Bouton cannot foreclose this trust deed for the full amount of his claim he has no standing in equity. It is only by virtue of the statute that a money decree can be rendered by a court of equity in a foreclosure proceeding, and the statute only provides for a deficiency decree for the balance remaining due after a sale of the property has failed to produce the full amount found to be due. That a money decree can be rendered, in a foreclosure suit, for a deficiency only, has been decided by both this court and the Appellate Court. In *Cotes* v. *Bennett*, 183 Ill. 82, it was de-

clared (p. 85): "It is only in virtue of power conferred by the statute a money decree can be rendered by a court of chancery in a foreclosure proceeding against the mortgagor or other person liable for the mortgage debt. (8 Am. & Eng. Ency. of Law, 264.)   Section 16 of chapter 95 of the Revised Statutes, entitled 'Mortgages,' authorizes courts in this State to render such decrees 'for any balance of money that may be found due to the complainant over and above the proceeds of the sale or sales' of the mortgaged premises, and provides that such a decree may be conditionally rendered at the time the decree of foreclosure and sale is entered, or that it may be entered after the sale and ascertainment of the balance due.   It is to be noted this statute authorizes such decrees to be rendered only 'for any balance of money that may be found due to the complainant over and above the proceeds of the sale or sales' of the mortgaged premises."

In *Phelan* v. *Iona Savings Bank,* 48 Ill. App. 171, the rule is declared in the following language (p. 175): "Decrees upon such bills [foreclosure] rested upon purely equitable principles and were solely for the purpose of foreclosing this right of redemption. The courts rendering them were without power or jurisdiction, in such proceeding, to render personal decrees for the indebtedness secured by the mortgage, or even for a part of such indebtedness remaining unpaid after the sale of the mortgaged premises. * * * The mortgagee might, if he desired a judgment *in personam,* bring his action at law upon the indebtedness, and might at the same time file a bill in chancery for the foreclosure of the mortgagor's equity of redemption. The remedies are concurrent. (4 Kent's Com. 184.) The powers and jurisdiction of the courts of Illinois have been increased in respect of such matters by statutory enactment, but with this statutory power added, the courts of our State are yet without jurisdiction to render judgments or decrees for the payment of the mortgage indebtedness against defendants in foreclosure proceedings.

The only addition to their power is such as is given by section 16 of chapter 95 of the Revised Statutes, which authorizes the rendition of a personal decree 'for the balance of money that may be found unpaid' after the mortgaged premises have been sold and the proceeds applied upon the indebtedness. A decree against the defendants in a foreclosure proceeding for the whole debt would, therefore, be wholly extra-judicial. In the case at bar the court did not attempt to exercise the statutory power, and it had otherwise no authority to render a money decree against any one."

In this case the trial court found that only $193.39, principal and interest, with $15.47 solicitor's fees, can be collected out of the mortgaged premises under the foreclosure of the trust deed. A deficiency decree is not asked because a sale of the mortgaged premises will not produce the amount found to be collectible, but for an entirely different purpose. Appellants having failed to recover the amount they claim to be due in this foreclosure proceeding, they ask to have a judgment upon the note, which we do not think is proper.

Appellant Wright makes the further contention that he is the equitable assignee of the Cameron note and trust deed, and that by the writings of May 3 and July 27 the Camerons are estopped from asserting any equities against him. The assignment to Wright was by a separate instrument, and was not such an assignment as is contemplated by section 4 of chapter 98 of our statutes, which is by endorsement on the note. The assignment could be no more than an equitable one, and Wright, as such equitable assignee, would take subject to any defenses which Robert Cameron, the maker of the note, might have against Gehr. "The only assignment which will cut off the equities of the maker of the note is an assignment made in conformity with the statute." *Peck v. Bligh,* 37 Ill. 317; *Haskell v. Brown,* 65 id. 29; *Melendy v. Keen,* 89 id. 395.

What has already been said with reference to the papers of May 3 and July 27 will also apply to the question of estoppel, which principle is sought to be invoked by appellant Wright. The evidence disclosed that Gehr and Wright, Jr., met appellant Wright, Sr., on the street, when Gehr solicited the loan of $7700 from him, proposing to put up other security not involved in this litigation, together with his equity in the Cameron note, which he informed him was pledged to Bouton for $5000. Wright, Sr., after a short conversation, went to the bank and drew his check, payable to Wright, Jr., who was the son of appellant J. G. Wright, with instructions to examine the papers, and if the securities and papers were satisfactory to make the loan and deliver the check. The same day Wright, Jr., did deliver the check and received the securities and the writing signed by Cameron of date July 27, 1893. We think Wright, Sr., made Wright, Jr., his agent to pass upon this loan. The son had full knowledge of all the facts and knew that Gehr's interest in the note was merely for the purpose of indemnity. He and Gehr were operating together, willing, if not active, agents in the attempt to defraud the Camerons, and Wright, Sr., was chargeable with the knowledge of his agent. It is quite certain that if Wright, Jr., lacked full knowledge of the real relation of Gehr and Cameron he had sufficient knowledge to put him upon inquiry, which, if made, would have prevented the transaction, if it was an honest one, in its inception.

Numerous assignments of error are made as to the findings of facts by the trial court. Concerning those findings we need only say that they do not appear to us to be clearly and manifestly against the weight of the evidence, and according to our practice we are not authorized to disturb them. It is the established rule of this court that in a chancery cause in which the chancellor, as here, heard the witnesses testify in open court, the findings of fact are not to be disturbed unless clearly

against the evidence. *Burgett* v. *Osborne*, 172 Ill. 227; *Delaney* v. *Delaney*, 175 id. 187; *Blomstrom* v. *Dux*, id. 435; *Elmstedt* v. *Nicholson*, 186 id. 580; *Mayrand* v. *Mayrand*, 194 id. 45; *McCormick* v. *Miller*, 102 id. 208.

The judgments of the Appellate Court are affirmed.

*Judgment affirmed.*