**In re CUTTY'S–GURNEE, INC., Debtor.**

**GREAT AMERICAN INSURANCE CO., Plaintiff,**

**v.**

**Kenneth J. BAILEY, Cristel Bailey, et al., Defendants.**

**Bankruptcy Nos. 88 B 14750, 89 A 1100.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Aug. 7, 1991.

See also 133 B.R. 929, 133 B.R. 969.

Philip Martino, Rudnick & Wolfe, Chicago, Ill., for plaintiff.

Jon Furlow, Sonnenschein, Nath & Rosenthal, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the Complaint of Great American Insurance Company to determine the validity, extent and priority of the liens claimed by various defendants, including MorAmerica Capital Corporation. A Counterclaim was filed by MorAmerica Capital Corporation (hereinafter MorAmerica) against Great American Insurance Company (hereinafter Great American) and this matter was set for trial. Prior to trial, MorAmerica and Great American filed cross-motions for summary judgment. The parties then agreed in lieu of trial to rest their proofs in this matter on their Stipulation of Facts, filed December 5, 1990. Oral arguments were presented by the parties and this matter was taken under advisement on January 14, 1991. The Court has jurisdiction in this core proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O). The following memorandum opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The debtor, Cutty's–Gurnee, Inc., filed its petition in bankruptcy on September 28, 1988, and both MorAmerica and Great American timely filed their proof of claims in this case. Great American holds a col-

lateral assignment of the beneficial interests in two land trusts holding title to the "Spruce Lake Resort" property executed by Kenneth Bailey, President of the debtor, Cutty's–Gurnee, Inc. Based on these collateral assignments Great American asserts a first-priority security interest against the proceeds from the sale of the Spruce Lake property. MorAmerica, however, has filed a counterclaim against Great American asserting that MorAmerica holds a valid mortgage interest in the Spruce Lake property which is superior to the collateral assignments of beneficial interest to Great American on these grounds: (1) the debtor granted the mortgage interest to MorAmerica prior to the assignment to Great American and Great American took such assignment with actual notice of MorAmerica's prior interest; (2) Great American knowingly and purposefully used its dominion and control over the debtor and its principal, Bailey, for its own benefit, and the claim of Great American must be equitably subordinated to the MorAmerica claim pursuant to § 510(c) of the Bankruptcy Code to prevent unjust enrichment of Great American and inequitable detriment to MorAmerica; (3) Great American has intentionally and tortiously interfered with the contractual rights of MorAmerica by refusing to exercise the power of direction over the land trusts to allow the debtor to fulfill its contractual obligation to direct the land trustees to execute a valid, enforceable mortgage instrument in favor of MorAmerica on the Spruce Lake property; and (4) that Great American breached a contractual obligation of good faith under the Uniform Commercial Code § 1–203. Great American denies these allegations in its answer to the counterclaim.

FACTS:

The parties have stipulated to the relevant material facts to be considered by the Court and have further stipulated to the admissability of all documents contained in their respective proofs of claim, the appendices to their cross-motions for summary judgment and to the deposition testimony relied upon in their respective memoranda and appendices. On the basis of this evidence, the Court makes the following findings of fact.

A. MorAmerica's Interest

The debtor herein, Cutty's–Gurnee, Inc., was incorporated on September 30, 1983, by Kenneth J. Bailey, Cutty's, Inc. and MorAmerica Capital Corporation, to develop the Spruce Lake Resort property as a trailer park. Title to the property was held in the name of two land trusts. The beneficiary of the land trusts was Kenneth Bailey. Bailey transferred his beneficial interest in the two land trusts to the debtor in exchange for (1) a mortgage on the property in the original principal amount of $1,450,656 and (2) one-third of the shares of common stock in Cutty's–Gurnee, Inc. MorAmerica contributed $300,000 in start-up capital in exchange for 295,000 shares of preferred stock and one-third of the shares of common stock. Cutty's, Inc., agreed to contribute expertise and services in developing the trailer park in exchange for one-third of the shares of common stock. In May 1984, MorAmerica loaned an additional $100,000 to the debtor to be used as working capital in exchange for a promissory note and a security interest in certain retail installment contracts for the sale of trailer park units held by the debtor.

In 1985, it became apparent to the shareholders of Cutty's–Gurnee that the debtor required additional funds to complete the development of the Spruce Lake property. One of the shareholders, Cutty's, Inc., had a falling out with the debtor and was no longer an active participant in the development. At this time, MorAmerica had not been repaid under the $100,000 loan and it was not anxious to remain in a $300,000 equity position with the debtor.

Bailey also owned a garden center near the Spruce Lake project. Great American had previously provided the necessary financing for that enterprise. Bailey approached Larry Foster, the loan officer at Great American who was responsible for collecting Bailey's defaulted garden center loan, to discuss obtaining additional financing for the Spruce Lake Resort project and

to attempt to cure the garden center loan default. Bailey informed Foster of the debtor's corporate structure and the fact that Cutty's, Inc., and MorAmerica each held a one-third interest in the debtor-corporation. Various financing arrangements were discussed and Foster proposed that Great American (1) purchase the outstanding installment contracts held by the debtor for $1,200,000, (2) apply $700,000 of this purchase price to the defaulted garden center loan, and (3) disburse the remaining $500,000 to the debtor for the development of the Spruce Lake project. As security for this transaction, Foster proposed that 100% of the stock of Cutty's–Gurnee be pledged to Great American. Pursuant to this proposal, Foster requested by letter dated December 27, 1985, that Bailey furnish to Great American the Cutty's–Gurnee partnership documents and "a signed copy of the transfer or assignment from your partner to you of all of his rights and interests in Cutty's–Gurnee."

Bailey, acting on this request, persuaded Cutty's, Inc., to release the stock it held and fully terminate its interest in the debtor. Bailey also approached MorAmerica regarding the refinancing proposal of Great American and the need to restructure MorAmerica's equity position. On April 9, 1986, Bailey met with Jerry Burrows, President of MorAmerica, and the parties agreed to, drafted and executed the following one page agreement (hereinafter the April 9th Agreement) which provides:

> This Agreement is made and entered into this 9th day of April, 1986, by and between Cutty's–Gurnee, Inc., Kenneth J. Bailey and MorAmerica Capital Corporation: (1) MorAmerica Capital Corporation agrees to convert its $400,000 investment in Cutty's–Gurnee, Inc., in the form of Common Stock, Preferred Stock and a $100,000 note into a $400,000 note due April 10, 1987. (2) Bailey and Cutty's–Gurnee, Inc., agree to pay off all obligations of Cutty's–Gurnee, Inc., to Greyhound Leasing Company. (3) Bailey and Cutty's–Gurnee, Inc., agree that upon the refinancing of the Gurnee Spruce Lake Project that it will provide MorAm-

erica Capital Corporation with a valid second mortgage on the Spruce Lake project.

The agreement is signed by Burrows on behalf of MorAmerica and by Bailey on behalf of Cutty's–Gurnee and himself.

In addition to the April 9th Agreement, the parties have stipulated to the admissibility of a brief letter dated April 9, 1986, from Burrows to Bailey, signed by Burrows and by Bailey on behalf of Cutty's–Gurnee, Inc., which states that it is intended to confirm the Agreement and its terms, and which authorized Bailey to surrender and cancel the MorAmerica stock certificates. This letter does not refer to the obligation to grant a second mortgage to MorAmerica upon refinancing.

Bailey and Burrows both testified that they intended the MorAmerica mortgage interest to be second to the first mortgage held by Bailey at that time. Burrows also testified that he understood the refinancing negotiations to be virtually completed and the actual loan to be imminent. Furthermore, Burrows stated that he understood that the purpose of the refinancing was to replace the existing line of receivables financing through Greyhound Leasing and that part of the loan was going to be used to clean up the prior financing.

Copies of the April 9, 1986 Agreement and the accompanying letter were delivered to Great American in December 1986. In a letter dated April 30, 1986, Ron Hayes, General Counsel for Great American, requested "[a]ll documents regarding the termination of the relationship with and the interest of Cutty's, Inc., Richard J. Cutler and MorAmerica Capital Corporation" in Cutty's–Gurnee. Bailey delivered the April 9 Agreement along with a number of other corporate documents to Foster in December of 1986 pursuant to this request. The documents included a two page table of contents which listed the "MorAmerica Agreement with Bailey" as item #9.

No further action was taken by MorAmerica and Cutty's–Gurnee regarding the April 9 Agreement until August 12, 1986. At that time MorAmerica obtained a Mortgage Note from Cutty's–Gurnee, executed

by Bailey as President, in the amount of $400,000 pursuant to the April 9 Agreement. This Note, dated August 12, 1986, provides that the principal amount of $400,000 is due on April 10, 1987, and that said Note "is secured by a Mortgage, dated the date hereof, given by the undersigned to the payee hereof, to which Mortgage reference is hereby made for the description of the property conveyed, the nature and extent of the security, and the rights of the holder of this Note in respect to such security, as defined herein." Despite this language, MorAmerica did not obtain a mortgage instrument at this time from Bailey, the debtor, the land trustees or any other party regarding the Spruce Lake property.

The August 12, 1986 Note was not paid when due and another Mortgage Note was executed on August 31, 1987 by Bailey as President of Cutty's–Gurnee in the principal amount of $400,000 due and payable on April 10, 1988. This Mortgage Note contains the same language regarding a "Mortgage dated the date hereof" and this time MorAmerica did receive a Mortgage, dated August 31, 1987. The mortgage was executed by Bailey, as President of Cutty's–Gurnee and it purported to grant a Mortgage on the Spruce Lake property to MorAmerica in the principal amount of $400,000. MorAmerica, however, did not at any time obtain a mortgage executed by the trustees of the two land trusts which held title to the Spruce Lake property. The August 31, 1987 mortgage contains a handwritten notation next to the signature of Bailey stating that "It is Agreed this will not be recorded for at least 60 days."

The August 31, 1987 Note was not paid on April 10, 1988, and MorAmerica filed a Notice of Lis Pendens on the Spruce Lake property on May 20, 1988, in Lake County, Illinois. The debtor filed its petition in bankruptcy on September 28, 1988.

On the basis of these transactions and documents, MorAmerica claims it has a valid mortgage against the property, and that any interest held by Great American pursuant to the refinancing in 1987 is subject to the interest of MorAmerica, since Great American had knowledge of the April 9, 1986 Agreement requiring the debtor to grant a second mortgage to MorAmerica upon refinancing of the Spruce Lake project before it took the collateral assignment of the beneficial interests in the land trusts.

B. The 1987 Great American Refinancing

Great American became involved in this matter as a result of its prior relationship with Kenneth Bailey, one of the shareholders of the debtor. Bailey had borrowed $950,000 in 1979 to finance Bailey's Garden Center and Stove Shop, hereinafter referred to as the garden center loan. Bailey defaulted on this loan numerous times. In an effort to cure the defaults, Great American and Bailey entered into several modifications and workout-type arrangements allowing Bailey additional time to pay the garden center loan. Nevertheless, Bailey was never able to repay the loan and was again in default in 1984 and 1985.

In 1984, Bailey and Larry Foster discussed the possibility of paying the defaulted garden center loan from his operation of the Spruce Lake Resort being developed by the debtor, Cutty's–Gurnee, Inc. Bailey explained the corporate structure of Cutty's–Gurnee to Foster and discussed the contributions and equity positions held by each of the shareholders, Cutty's, Inc., MorAmerica and himself. Foster's notes of the conversation reflect this information even though he testified that he did not specifically recall the discussion. Great America's knowledge of MorAmerica's equity position is furthered evidenced by the letter from Hayes asking for the documents terminating the interests of MorAmerica and Cutty's, Inc.

In 1985, Bailey approached Foster regarding the need for additional financing for the Spruce Lake project and to cure the garden center loan default. Foster agreed to consider the loan. He testified at his deposition that he viewed Cutty's–Gurnee as an additional asset and his entire purpose in establishing the Cutty's–Gurnee loan initially was to find a means of helping Bailey pay the garden center loan. In a letter to Bailey dated December 27, 1985,

Foster refers to "our conversation on the 24th" and indicates that he spent considerable time discussing Bailey's request for financing with Ron Hayes, General Counsel for Great America. Foster's letter states that in order to go ahead with the Cutty's–Gurnee loan and the garden center refinancing, Bailey would need to furnish, among other things, a copy of:

the original executed contract between you and your partner on the trailer park, including any changes as follows:

a. The document establishing the partnership,

b. The obligations of both partners,

c. Any modifications to the instruments,

d. Your obligations to the buyer of locations,

e. Any documents establishing your obligations as to the overall park and your commitments to perform and deliver certain products.

IT WOULD BE CRITICAL THAT YOU FURNISH WITH THESE DOCUMENTS A SIGNED COPY OF THE TRANSFER OR ASSIGNMENT FROM YOUR PARTNER TO YOU OF ALL OF HIS RIGHTS AND INTERESTS IN THESE PROPERTIES IN ORDER THAT WE MIGHT HAVE AN ASSET THAT WOULD HAVE VALUE TO OUR PEOPLE.

Foster came up with the proposal under which Great American would (1) purchase the installment contracts held by the debtor for $1,200,000, (2) apply $700,000 of the purchase price to the garden center loan, and (3) disburse the remaining $500,000 for development of the Spruce Lake project. This proposal is set forth in an internal memorandum dated March 3, 1986, from Foster to Mr. R.F. Walker, and is described as "a workout—where we control everything—I'd have to supervise and *control* it." Foster's memorandum states:

I propose [this option], subject to: (1) Ron Hayes clears up all legal items, liability, etc., to his satisfaction. (2) We control all contracts, and fund dispersals. I'll do that personally. (3) We receive a 10 percent ownership position; or $300,-000 at end of our note as payment for our time and services rendered. We need to start at break in weather if we are to make the deal work.

Plese [sic] advise.

As set forth in the stipulated facts, Foster also proposed that this loan be secured by the stock of Cutty's–Gurnee.

Bailey testified that on the basis of his ongoing negotiations with Foster, he believed the refinancing deal with Great American was settled and that he arranged the close-out of MorAmerica's equity interest pursuant to this understanding, as requested by Foster's letter of December 24, 1985. In addition to Foster's request for documents, Ron Hayes, general counsel to Great American, also requested "all documents regarding the termination of the relationship with and the interest of Cutty's, Inc., Richard J. Cutler, and MorAmerica" in Cutty's–Gurnee, in a letter to Bailey's attorney dated April 30, 1986. At this time, Bailey and MorAmerica had already concluded the April 9, 1986 Agreement terminating MorAmerica's equity interest.

Bailey was able to acquire sole ownership of the debtor as requested by Great American, but the specific $1,200,000 workout proposal outlined in the March 3, 1986 memorandum was never consummated by Bailey and Great American. Bailey delivered the April 9, 1986 Agreement between the debtor and MorAmerica to Foster in December of 1986, along with a cover sheet listing the contents and several additional corporate documents as requested by Foster's letter of December 27, 1985, and Hayes' letter of April 30, 1986. At this time or shortly thereafter, however, Bailey informed Great American that the Spruce Lake property was subject to over $500,000 in liens, including a lien held by Greyhound Leasing which was in foreclosure. In light of this new information, the March 3, 1986 work-out proposal made by Foster was not implemented as originally discussed.

According to Bailey, and as stipulated to by the parties, he was not informed by Great American that they would require a collateral assignment of the beneficial interests in the Spruce Lake property land trusts until late 1986 or early 1987, after

they learned of the outstanding liens against the property. At this time, Great American apparently developed a new loan proposal which was completed on March 24, 1987. Ron Hayes, general counsel for Great American, reviewed the documents from Bailey regarding Cutty's–Gurnee, which had been delivered to him by Foster in December of 1986, and also reviewed the title to the Spruce Lake property. Hayes testified that the title search showed the property to be subject to the mortgage held by Bailey pursuant to his contribution of the property to the corporate debtor and subject to over $500,000 in additional liens. The 1987 loan agreement contemplated by the parties would require Bailey to release his mortgage and would pay the other liens with the loan proceeds. Hayes testified that although he reviewed the documents delivered to him before approving the 1987 loan agreement, he did not specifically recall reviewing the April 9, 1986 Agreement between MorAmerica and Cutty's–Gurnee; that he never discussed the April 9th Agreement with anyone; and that he was not aware that MorAmerica claimed a mortgage against the property when the 1987 loan agreement was made. The parties have stipulated that Bailey did not discuss the April 9th Agreement with anyone at Great American and that MorAmerica had no written or oral communication with Great American regarding Cutty's–Gurnee.

After conducting the title search and review of the Cutty's–Gurnee documents, Great American entered into a loan agreement with Cutty's–Gurnee, Bailey and one Igor Borkowski on March 24, 1987, under which it loaned $1,500,000 to these three parties. The $1,500,000 loan was secured by all the assets of Cutty's–Gurnee, a pledge of 100% of the Cutty's–Gurnee stock, a pledge of all the retail installment contracts held by Cutty's–Gurnee, and by a collateral assignment of the beneficial interests in the Spruce Lake property land trusts. The loan agreement also required Bailey to release his mortgage as a condition of the loan and required Bailey, on behalf of Cutty's–Gurnee, to execute the collateral assignment of the beneficial interests.

The parties have stipulated that the proceeds of the $1,500,000 were used to pay off mortgages and liens of record in excess of $500,000, including the mortgage in foreclosure held by Greyhound Leasing, and to pay contractors upon the completion of the Spruce Lake project. The final disbursement was made in July of 1987. It is also stipulated that none of the 1987 loan proceeds were applied to Bailey's defaulted garden center loan, and no part of the loan proceeds were used to pay MorAmerica's $400,000 loan.

COUNT I—MORAMERICA'S COUNTERCLAIM SEEKING A DECLARATION OF PRIORITY BASED ON THE DOCTRINES OF EQUITABLE LIEN AND ACTUAL NOTICE THEREOF

In Count I of its Counterclaim, MorAmerica argues that it is entitled to a declaratory judgment finding that it holds a valid mortgage interest which takes priority over the Great American claim because at the time Great American took such interest it had actual notice of MorAmerica's prior lien. Having fully reviewed the submissions of the parties and being fully advised of the premises, the Court concludes that MorAmerica is entitled to prevail under the doctrines of equitable mortgage and inquiry notice. The April 9 Agreement created an equitable mortgage under Illinois law which attached to the Spruce Lake property at the time of contracting. This interest was in existence prior to Great American's receipt of the collateral assignment of the beneficial interests in the land trusts. Furthermore, Great American had actual knowledge of facts which placed it under a duty of further inquiry regarding this interest prior to taking a competing interest. Thus, it is properly charged with knowledge of the facts that such an inquiry would have produced, specifically that MorAmerica claimed a mortgage intended to be second only to Bailey's first mortgage which was to become effective upon the Great American refinancing. As a result of such knowledge, Great American cannot now claim a priority position over MorAm-

erica's prior interest. The Court hereby orders that a declaratory judgment be granted in favor of MorAmerica and against Great American pursuant to Count I of the MorAmerica counterclaim.

A. Great American's Collateral Assignment of Beneficial Interest is A Valid Security Interest.

The Court finds that Great American holds a valid security interest in the beneficial interests of the land trusts by virtue of the collateral assignment of those beneficial interests executed by Bailey, on behalf of Cutty's–Gurnee, and that this security interest attached to the proceeds of the sale of the property pursuant to Article 9 of the Uniform Commercial Code.

■ In an Illinois land trust, the land trustee holds both legal and equitable title to the property. The land trust beneficiary holds a personal property interest in the trust, but does not possess a direct interest in the real estate *res* of the trust. *In re Estate of Alpert*, 95 Ill.2d 377, 382, 69 Ill.Dec. 361, 447 N.E.2d 796 (1983); *Melrose Park National Bank v. Melrose Park National Bank*, 123 Ill.App.3d 282, 78 Ill. Dec. 622, 462 N.E.2d 741 (1st Dist.1984); *In re Romano*, 426 F.Supp. 1123 (N.D.Ill. 1977). This personal property interest may be transferred, assigned or pledged as security. The creation of a security interest in personal property in Illinois is governed by Article 9 of the Illinois Uniform Commercial Code, Ill.Rev.Stat. ch. 26 ¶ 9–101 *et seq.* (1987). Perfection and priority issues involving the beneficial interest in an Illinois land trust are also governed by the Illinois Uniform Commercial Code. *First Federal Savings and Loan Ass'n. v. Pogue*, 72 Ill.App.3d 54, 27 Ill.Dec. 588, 389 N.E.2d 652, 655 (Dist.1979). Under Illinois law, the collateral assignment of a land trust beneficial interest to secure a note does not convert this personal property interest into a real estate mortgage. *Melrose Park National Bank*, 123 Ill.App.3d at 285–86, 78 Ill.Dec. at 624, 462 N.E.2d at 743 (citing *American National Bank & Trust Co. v. Ryan*, 106 Ill.App.3d 434, 436 N.E.2d 37 (1st Dist.1982)). Applying these principles to the collateral assignment of beneficial interest given to Great American by Cutty's–Gurnee, the validity and priority of Great American's asserted lien against the proceeds of sale of the trust *res* must be determined under the Illinois Uniform Commercial Code.

Section 9–302 of the Illinois Uniform Commercial Code provides that "(1) A financing statement must be filed to perfect all security interests except the following: ... (c) a security interest created by an assignment of a beneficial interest in a trust or a decedent's estate." Section 9–303 of the Uniform Commercial Code provides that "(1) A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in § 9–302, 9–304, 9–305 and 9–306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches." Attachment of a security interest occurs under § 9–203(2) when: "(a) the collateral is in possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...; and (b) value has been given; and (c) the debtor has rights in the collateral."

■ In this case, the security interest of Great American attached to the beneficial interests in the land trusts upon the completion of (1) the execution of the promissory note and the collateral assignments to secure the notes on March 12, and March 13, 1987, and (2) the giving of value when the loan agreement was executed and became binding on March 24, 1987. At the very latest, attachment occurred in July 1987 when the last disbursement of the loan proceeds was made and value was fully given. At this time MorAmerica had not obtained a mortgage instrument from any party.

Following attachment, Great American needed to comply with § 9–303 to perfect its security interest. Section 9–303 incorporates § 9–302, governing perfection without the need to file an Article 9 financing statement, and § 9–306 governing the secured party's rights in the proceeds on

disposition of the collateral. Section 9–302 provides for perfection of a security interest in the beneficial interest of a trust without filing a financing statement and 9–306 extends the perfected security interest to the proceeds. The Order entered by this Court authorizing the sale of the Spruce Lake property provides that the liens and security interests of the various claimants shall attach to the proceeds. Thus, Great American held a valid, perfected security interest in the beneficial interests of the land trusts at the time of the commencement of this case and this interest attached to the proceeds upon the subsequent sale of the collateral.

**B. The Mortgage Interest Promised to MorAmerica in the April 9 Agreement is Enforceable Under Illinois Law as an Equitable Mortgage.**

Moramerica, however, asserts that it holds a mortgage interest which has priority over the security interest of Great American. In Count I of its Counterclaim, MorAmerica argues that it is entitled to a declaratory judgment finding that it holds a valid mortgage interest which takes priority over the Great American Claim because at the time Great American took such interest it had actual notice of MorAmerica's prior lien.

*1. No actual mortgage was granted by the land trustees holding title to the Spruce Lake Property.*

The mortgage interest claimed by MorAmerica is based upon the April 9, 1986 Agreement; the August 12, 1986 Mortgage Note; the August 31, 1987 Mortgage Note; and the August 31, 1987 Mortgage Instrument. Although MorAmerica may possess some equitable mortgage interest, these documents are insufficient to convey an actual, valid mortgage at law on the Spruce Lake property, since no such mortgage has been granted by the trustees of the land trust.

 Legal and equitable title to the Spruce Lake property was held by the land trust trustees. The debtor, as the beneficiary thereof, could not grant a mortgage against the property or create a lien against the real estate since it held only a personal property interest in the land trust. *In re Estate of Alpert,* 95 Ill.2d 377, 69 Ill.Dec. 361, 447 N.E.2d 796 (1983); *Melrose Park National Bank,* 123 Ill.App.3d 282, 78 Ill.Dec. 622, 462 N.E.2d 741 (1st Dist.1984). Such an action could only be taken by the trustees of the land trusts holding record legal title. Thus, the Mortgage Instrument dated August 31, 1987, was insufficient to create a legal and binding mortgage on the property.

*2. The promise to convey a mortgage contained in the April 9 Agreement created an equitable mortgage at the time of contracting.*

MorAmerica argues that the April 9, 1986 Agreement created an equitable mortgage on the Spruce Lake property which attached at the time of contracting, and that it is entitled to recover the value of this equitable lien from the proceeds of the sale thereof. MorAmerica further argues that this equitable lien is entitled to a priority position over Great American's claim since Great American had actual or inquiry notice of MorAmerica's interest at the time it took the collateral assignment of the beneficial interests in the land trusts. The Court concludes that an equitable mortgage exists in favor of MorAmerica, which must be given priority over Great American's subsequent collateral assignment of beneficial interest.

 Illinois law recognizes and will enforce an equitable lien or mortgage when there is an "express executory agreement which sufficiently indicates an intention to make a particular property therein described a security for debt or which promises to convey or assign the property...." *First National Bank v. Hans,* 143 Ill. App.3d 1033, 98 Ill.Dec. 150, 493 N.E.2d 1171 (2d Dist.1986). An express grant is not required to create such an equitable lien, it need only appear from the document that the parties intended that the property be held, given or transferred as security. *Id.* at 1036, 98 Ill.Dec. 150, 493 N.E.2d 1171; *Hibernian Banking,* 295 Ill. 537, 129

N.E. 540 (1920). Such an equitable lien has also been upheld when it was promised orally rather than created by a written instrument, so long as the intent to pledge the property as security was apparent from the facts and circumstances. *Lohmeyer v. Durbin,* 206 Ill. 574, 69 N.E. 523 (1903); *Grigaitis v. Gaiduskis,* 214 Ill.App. 111 (1st Dist.1919). The basis of the equitable lien comes from the maxim that "equity regards as done that which ought to be done." *Lohmeyer v. Durbin,* 206 Ill. 574, 69 N.E. 523 (1903). Equity also requires, however, that one seeking equitable relief cannot take advantage of his own wrong and such relief may be denied where the applicant is guilty of misconduct, fraud or bad faith. *Metcalf v. Altenritter,* 53 Ill. App.3d 904, 908, 12 Ill.Dec. 1, 369 N.E.2d 498 (5th Dist.1977).

■ There are two basic types of equitable lien situations. The first situation involves a deed which on its face appears to be an absolute conveyance of a particular piece of real estate. The equitable lien doctrine is applied to treat the deed as a mortgage rather than a transfer of title when it appears that the parties intended such deed to serve only as security for a specific debt. *See, e.g., Beelman v. Beelman,* 121 Ill.App.3d 684, 77 Ill.Dec. 196, 460 N.E.2d 55 (5th Dist.1984). The party asserting that the deed absolute in form was intended only to create a mortgage has the burden of proving this position by clear and convincing evidence. *Metcalf v. Altenritter,* 53 Ill.App.3d 904, 12 Ill.Dec. 1, 369 N.E.2d 498 (5th Dist.1977). The factors relevant to proving such intent include: the relationship of the parties, circumstances of the transfer, adequacy of the consideration given for the transfer, the conduct of the parties after the transfer and whether possession of the property was relinquished by the transferor. *Beelman,* 121 Ill.App.3d at 690, 77 Ill.Dec. at 200, 460 N.E.2d at 59.

The second equitable lien situation arises when there is an unfulfilled promise to grant a mortgage or lien against or an interest in a specific parcel of real estate as security for a specific obligation. MorAm-erica claims such an equitable lien based on the fact that Bailey, acting on behalf of Cutty's–Gurnee, Inc., promised that Cutty's–Gurnee would convey a valid second mortgage to MorAmerica when the Spruce Lake project was refinanced in exchange for MorAmerica's release of its equity position and prior secured note. This promise, however, was never fulfilled. MorAmerica did receive a mortgage note from Cutty's–Gurnee in August 1986 evidencing the obligation and it was granted a mortgage on the property by Cutty's–Gurnee on August 30, 1987, but Cutty's–Gurnee had already given a collateral assignment of its interest in the property at this time and MorAmerica never received a mortgage from the land trustees, the record owners of the property. To prevail over the collateral assignment of the beneficial interest to Great American, MorAmerica must establish by clear and convincing evidence that (1) that an equitable lien exists based on the parties' intent to pledge the Spruce Lake property as security for the obligation to grant a mortgage as set forth in the April 9, 1986 Agreement and (2) that Great American is charged with knowledge of that interest.

■ The requirements for a creation of an equitable lien are (1) "a debt, duty or obligation owing by one person to another," and (2) "a res to which that obligation fastens." *In re Brass Kettle Restaurant,* 790 F.2d 574, 575 (7th Cir.1986). The intent to effect a security arrangement involving specific property, specific parties and a specific obligation must appear in the express language of the transfer documents or the surrounding circumstances. *U.S. v. Canellis,* 490 F.Supp. 1125, 1129 (N.D.Ill.1980); *Hibernian Banking Association v. Davis,* 217 Ill.App. 36, *aff'd,* 295 Ill. 537, 129 N.E. 540 (1920). The equitable lien cases focus on the intent of the parties to grant a mortgage and look at the following factors as evidence of such intent: (1) whether the promise is contingent upon some future event, which is specifically described; (2) whether the property to be pledged is specifically identified; (3) whether the parties involved are specifically identified; (4) whether the pledge relates to a specific obligation or debt; and (5) whether

the lien is asserted against the alleged mortgagor or against a third-party purchaser for value.

The Illinois Supreme Court recognized in *Lohmeyer v. Durbin*, 206 Ill. 574, 69 N.E. 523 (1903), that an oral agreement to give a purchase money mortgage in exchange for a deed to a specific parcel of real estate created an equitable lien which could be foreclosed. "Under that maxim that equity will treat that as done which ought to be done, the agreement to execute a mortgage to secure the payment of the purchase money could be treated as such a mortgage." *Id.* at 580, 69 N.E. at 525. The court in *Lohmeyer* did not discuss the exact terms or language of the promise underlying the equitable mortgage or whether it was conditioned on any future events, apparently relying upon the finding of intent to grant a mortgage which had been made in the prior foreclosure proceeding.

Relying upon *Lohmeyer*, the Appellate Court in *Grigaitis v. Gaidauskis*, 214 Ill. App. 111 (1919), held that an oral promise to grant a mortgage at the end of one year if the loan taken to purchase a parcel of real estate was not repaid was sufficient to create an equitable lien which was enforceable against a third party holding a trust deed granted after the suit to enforce the oral promise was filed. The plaintiff in *Grigaitis* alleged that: (1) the defendants, his niece and her husband, asked him to lend them $1,500 which they planned to use as part of the purchase money for a specific parcel of real estate; (2) he agreed to loan $1,200 for a one-year period; (3) the defendants orally promised that if they did not pay the loan within the year they would give him a mortgage; and (4) the defendants failed to repay the loan and refused to grant him a mortgage as promised. Thus, the plaintiff asserted a lien against the property and sought to have the property sold to satisfy such claim.

The defendants argued that the alleged oral agreement to give a mortgage was too vague and indefinite to be enforced in equity. The court found that the evidence presented sufficiently established that the alleged loan had been made and that it related to a definite piece of real estate purchased by the defendants with the loan proceeds. The court went on to hold that the oral promise to give a mortgage on this specific property in the future if the purchase money loan was not repaid was sufficiently definite to create an equitable mortgage on that property, which attached at the time of contracting.

> There can be no doubt upon the authorities that where one party advances money to another upon the faith of a verbal agreement by the latter to secure its payment by a mortgage upon certain lands, but which is never executed, ... equity will impress upon the land intended to be mortgaged a lien in favor of the creditor who advanced the money for the security and satisfaction of his debt. This lien attaches upon payment of the money.

*Id.* at 117 (quoting *Sprague v. Cochran*, 144 N.Y. 104, 38 N.E. 1000 (1894)).

The court also quotes a treatise, *Pomeroy's Equity Jur*, § 1231, as stating:

> The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose rather than at the form, and if the intent appears to give, or to charge, or to pledge property real or personal, as a security for an obligation and the property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows.

Thus, the court found that an equitable lien was created in favor of the plaintiff when he gave consideration and was promised a mortgage upon the specified real estate, and that such lien was enforceable against the holder of the subsequent trust deed.

The court was not troubled by the conditional nature of the promise to convey a mortgage and the fact that such obligation only became operative if the loan was not repaid in one year. The oral promise imposed a present and binding commitment upon the promisor, so that the lien attached at the time the promise was made, rather than merely exhibiting an understanding that the parties would enter into such an

assignment or security arrangement in the future if certain conditions were met. Although the court did not discuss whether the third party grantee of the trust deed given after the suit was filed had actual notice of the plaintiff's claim or of the pending suit, it affirmed the finding of the master that the trust deed was subject to the lien of the plaintiff.

■ Applying the basic principles set forth in *Lohmeyer* and *Grigaitis*, it appears that Illinois law would enforce the equitable mortgage asserted by MorAmerica against the Spruce Lake property. Where the intent of the parties to create a mortgage or security interest in a specific piece of property as consideration for a specific obligation clearly appears in a written instrument, or the surrounding circumstances at the time of making, but such promise remains unperformed, equity dictates that an equitable lien evidencing such intent be imposed upon and enforced against the property. In this case, the April 9, 1986 Agreement between Cutty's–Gurnee and MorAmerica evidences such an intent and is sufficient to create an equitable mortgage in favor of MorAmerica.

■ The April 9, 1986 Agreement states in pertinent part, "Bailey and Cutty's–Gurnee, Inc., agree that upon the refinancing of the Gurnee Spruce Lake Project that it will provide MorAmerica Capital Corporation with a valid second mortgage on the Spruce Lake Project." This language clearly identifies the property to be pledged as security and expressly states the intent to create a mortgage in favor of MorAmerica. Furthermore, Bailey and Jerry Burrows both testified that it was their intent to create such a mortgage as consideration for MorAmerica's release of its stock and security interest in the retail installment contracts. When asked, "Is there any doubt in your mind, Mr. Bailey, that what you intended when you entered into this agreement was to give MorAmerica a valid second mortgage in the real estate behind your interest in the real estate?", Bailey replied, "No. That's what we agreed on. There it is right there."

Burrows also testified that although there was no specific time designation, he understood the refinancing to be in the final stages of negotiation so that the entire transaction would be completed in the immediate future. This intent is further evidenced by the August 12, 1986 Mortgage Note, the August 31, 1987 Mortgage Note and the August 31, 1987 Mortgage Instrument. Based on this testimony, the express language of the agreement and the surrounding circumstances, the Court concludes that the April 9 Agreement operated to create an equitable mortgage in favor of MorAmerica which attached to the Spruce Lake property at that time.

Great American argues that the MorAmerica claim is distinguishable from the other equitable lien cases in that the obligation to convey a second mortgage upon refinancing is considerably more vague, ambiguous and contingent than those promises involved in *Grigaitis* and *Lohmeyer*. According to Great American,

> The April 9 Agreement does not grant or evidence the granting of a present mortgage. It is at best evidence of an intent to do so, at an indeterminate time in the future, and after another, undefined event—the refinancing has taken place. [Great American] could find no reported decisions which awarded lien status under such a document.

Great American goes on to argue that even if it had actual knowledge of this agreement when it took the collateral assignment of beneficial interests, the mere fact that it held information regarding a purpose or agreement to grant a mortgage or lien in the future would not serve to preclude its claim from priority status or to make its interest subject to that unfulfilled intention. Great American's argument asks the Court to find that the parties intended only to document their basic understanding, which would be finalized at a later date if refinancing became available and a second mortgage was possible. Based on all the relevant facts and testimony, as well as the express language used in the April 9 Agreement, this conclusion must be rejected.

The appellate court held in *National Bank of Albany Park in Chicago v. Newburg*, 7 Ill.App.3d 859, 289 N.E.2d 197 (1st Dist.1972), that the creation of an equitable assignment depends upon the intent of the parties.[1] In *Newburg*, the court was faced with a priority dispute between a claimant under a settlement order from a prior judicial proceeding and a garnishment creditor seeking to attach the settlement fund. The issue was whether the language of the settlement order created an immediate equitable assignment of or lien against the settlement fund which would take priority over a subsequent garnishment. As stated by the court, the question of what constitutes a present appropriation sufficient to create an equitable assignment is one of intention to be gathered from the language used, in light of the attendant circumstances. The assignor must not retain any control over the fund, any authority to collect, or any power of revocation. *Id.* at 866, 289 N.E.2d at 202. Under this standard, the court found that the language of the settlement order contemplated a future assignment of the proceeds of any settlement once Newburg came into possession thereof rather than a present transfer of the settlement fund from Newburg to the claimant. *See also Hibernian Banking Ass'n. v. Davis*, 295 Ill. 537, 129 N.E. 540 (1920) (holding that written agreement to pay notes out of the proceeds of sale, if any, of certain property does not create an immediate assignment of such proceeds).

Applying this standard to the April 9 Agreement, the Court finds that it embodies the intent of the parties to make a present commitment to convey a mortgage to MorAmerica in the future. Both Bailey and Jerry Burrows testified that this was their intent, that negotiations regarding the refinancing were thought to be in the final stages and that they considered the transaction to be imminent. Furthermore, although contingent in the sense that the timing of performance is linked to a future event, the language used does not reserve any discretion, control or power of revocation for Bailey or Cutty's–Gurnee. Rather, the language used indicates that it is agreed that the mortgage will be given upon refinancing, without further negotiation between the debtor and MorAmerica. It is clear from the testimony that Bailey and MorAmerica understood "upon refinancing" to refer to the pending transaction with Great American. There is no evidence to show that the parties left the final negotiations uncompleted with the intention of allowing Bailey and Cutty's–Gurnee to exercise some future discretion and control over the second mortgage proposal. The intent of the parties is not diminished or extinguished by the fact that MorAmerica may have been motivated by other factors in its equity-to-debt conversion, the fact that it frequently held second priority lender status in its business, or by the fact that the mortgage referred to in the April 9 Agreement was not highlighted as the most significant aspect of the deal. Based on these circumstances and the express

---

1. There are several cases which apply Illinois law in the context of contingent fee arrangements and address the somewhat analogous issue of whether parties intended to create an immediate assignment of the contingent recovery or merely expressed an intention to pay such fees from the recovery fund, with the amount to be determined by the value of the recovery fund, if it became available. *See, e.g., In re Brass Kettle Restaurant*, 790 F.2d 574 (7th Cir.1986); *McKee Berger Mansueto Inc., v. Board of Education of City of Chicago*, 691 F.2d 828 (7th Cir.1982). Similarly, there are cases dealing with purported assignments of insurance type settlements where the claimant asserts that an equitable lien attached at the time of contracting and the defense argues that the settlement agreement represented only the intent to make such an assignment at the time of recovery. *See, e.g., Marbach v. Gnadl*, 73 Ill.App.2d 303, 219 N.E.2d 572 (1st Dist.1966); *National Bank of Albany Park in Chicago v. Newburg*, 7 Ill.App.3d 859, 289 N.E.2d 197 (1st Dist.1972). These cases are distinguishable and are not helpful in determining whether the April 9 Agreement created a present obligation to convey a mortgage to MorAmerica since they were decided on the basis of the precise language used in the contingent fee contract. The issue in these cases is whether the fee contract created an immediate actual assignment at the time of contracting or whether it represented a mere personal promise to pay fees in an amount equal to a specified portion of the recovery fund or out of the proceeds of such fund. This type of analysis and literal interpretation is simply not instructive as to the intent expressed by these parties in the April 9, 1986 Agreement.

testimony of the parties, the Court finds that the parties intended to pledge the Spruce Lake property as security for the $400,000 Note to MorAmerica, and that this agreement represented a present and binding commitment with performance to become due and the mortgage executed upon refinancing of the project.

 Under the standards of *Grigaitis* and other Illinois cases, all that is required for an equitable lien is the intent of the parties to pledge a specific property as security for a specific obligation. These elements are clearly satisfied here. Thus, MorAmerica is entitled to an equitable lien against the Spruce Lake property which attached at the time of the April 9, 1986 Agreement.

3. *The equitable mortgage held by MorAmerica must be given priority over the interest of Great American since it had actual notice of this prior equitable interest at the time it took the collateral assignments of the beneficial interests.*

 Once it has been determined that MorAmerica holds a valid equitable mortgage, the issue becomes whether this interest takes priority over the subsequent collateral assignment of the beneficial interests in the land trusts given to Great American. As a general rule, the priority of competing liens is determined by the rule of "first in time is first in right." Under this rule, the order of priority depends upon the date of attachment of the lien. This basic rule, however, has been modified by the duty to record liens and conveyances of title. Illinois law provides that a written mortgage shall not take effect and shall be held to be void as to all creditors and subsequent purchasers without notice until such mortgage has been recorded. Ill.Rev. Stat. ch. 30, ¶ 29 (1989). Under this statute, an unrecorded mortgage cannot take priority over the interest of a creditor or subsequent purchaser who acquired an interest in the property without having notice of the prior unrecorded mortgage. A subsequent purchaser who has notice of an existing unrecorded interest, however, cannot take priority over such interest by recording first. The statute refers to the duty to record instruments in writing and by its literal terms does not apply to an equitable mortgage. Case law, however, establishes that under the principles of equity, a party with notice of any existing equitable interest, claim or right in the same property is liable in equity to the same extent and in the same manner as the person from whom he made the purchase. *Rohde v. Rohn*, 232 Ill. 180, 83 N.E. 465 (1908). Applying this rule to the competing claims of MorAmerica and Great American, if Great American had actual notice of MorAmerica's existing interest at the time it acquired its interest, it is bound by such claim the same as the debtor and Bailey are bound.

 Great American knew of MorAmerica's prior equitable mortgage since they were given a copy of the April 9, 1986 Agreement, which was executed in connection with Great American's request for termination of MorAmerica's equity position, and these documents were admittedly reviewed by general counsel for Great American before they undertook the 1987 refinancing and collateral assignments. Great American, however, argues that notice does not control the issue of priority when the subsequent lienholder merely has knowledge of an agreement to grant a mortgage in the future, rather than knowledge of an actual existing mortgage. To support this position, Great American relies upon the decision of an Illinois Appellate Court in *St. Boniface Building & Loan Ass'n. v. Demopoulos*, 302 Ill.App. 614, 24 N.E.2d 171 (1st Dist.1939).

In *Demopoulos*, the court was faced with the competing claims of the bank, which had loaned funds for the remodeling and construction of a building and had purportedly taken two mortgages on the property in connection with this loan, and the claim of the defendant contractor who had done the work on the building and who subsequently acquired a trust deed covering the same property. The mortgages allegedly held by the bank were not recorded and the mortgage documents them-

selves could not be found and were therefore not produced at trial. The bank argued, however, that the actual mortgages did exist, that the documents had somehow been lost, that the defendant had knowledge of the prior mortgages when he subsequently acquired his trust deed, and that based on such notice the defendant was not a bona fide purchaser and could not take priority over their unrecorded mortgage. The defendant argued that if no mortgages were actually executed, he was not barred from taking a subsequent mortgage on the same property even though he knew of the agreement to grant a mortgage to the bank. *Id.* at 617, 24 N.E.2d at 173. According to the defendant, it is a settled rule that one who takes a mortgage or lien with actual knowledge of an earlier, unrecorded lien upon the same property takes it subject thereto and will not be permitted to gain priority by recording his interest first, but it must be knowledge of the actual existence of the prior conveyance or encumbrance and nor merely information of a purpose or agreement on the part of the grantor to make or give it.

The court did not discuss the defendant's argument that notice of an agreement to execute a future mortgage is insufficient to prevent the later claimant from taking priority since it concluded that the mortgages were actually executed. The rule set forth and characterized by the court as the defendant's argument is therefore dicta. The court did not analyze the rule or the policy considerations connected with it, nor did it discuss the authorities cited by the defendant. The court found that the mortgages existed and that the defendant had knowledge that the loan by the bank was made since such a loan was necessary to remodel the building. On the basis of this knowledge, the defendant "was thereby charged with notice of all the facts, which would indicate that there was an incumbrance upon the land and that the money paid to him as a contractor was the money realized from a loan secured from the [bank] by [Demopoulos]." *Id.* at 620, 24 N.E.2d at 174. The unrecorded mortgages held by the bank thus had priority over the defendant's later-acquired trust deed which was taken with knowledge of the earlier mortgages.

*Demopoulos* did not hold that it is the settled law in Illinois that one having knowledge of an agreement to give a mortgage is not thereby barred from subsequently obtaining a lien on the same property since the court found an actual mortgage in that case. This Court therefore cannot apply *Demopoulos* to hold that any knowledge Great American had of the debtor's agreement to convey a mortgage to MorAmerica upon refinancing would be insufficient *as a matter of law* to subordinate Great American to that prior equitable mortgage interest. Rather, the issue of notice and priority of an equitable lien must be addressed on a case-by-case basis according to the facts and equities. Specifically, the facts must be examined to determine whether the subsequent claimant held actual or inquiry notice of the prior equitable mortgage.

Actual notice is that knowledge the subsequent claimant had at the time he acquired his claim. Constructive notice is knowledge that the law imputes to a purchaser or lien claimant, regardless of the actual knowledge held at the time he acquired his claim. There are two kinds of constructive notice: record notice and inquiry notice. Under the doctrine of record notice, when a mortgage is properly recorded, the public record provides constructive notice of this interest to the whole world. Inquiry notice is the knowledge the law imputes to a lien claimant or purchaser of real property when such claimant is under a duty of inquiry. Inquiry notice imputes knowledge of all facts that a diligent inquiry would have brought to light. *Miller v. Bullington*, 381 Ill. 238, 44 N.E.2d 850 (1942).

The lien claimant's duty of inquiry depends upon all the facts and circumstances. It is clear that where a physical inspection of the property would reveal an adverse interest or where there is a party in possession other than the record title owner, the subsequent lien claimant has a duty to inquire of the possessor as to his interest and is charged with knowledge of the facts

discoverable from such an inquiry or inspection. *Miller,* 381 Ill. at 244, 44 N.E.2d at 853; *Burnex Oil Co. v. Floyd,* 106 Ill. App.2d 16, 23, 245 N.E.2d 539, 544 (1st Dist.1969); *In re Ehrlich,* 59 B.R. 646, 650 (Bankr.N.D.Ill.1986).

Outside of these types of obvious inconsistencies, however, it is not so clear what facts will suffice to create a duty of further inquiry. The general rule is that

> where the court is satisfied that the subsequent purchaser acted in bad faith, and that he either had actual notice or might have had that notice had he not willfully or negligently shut his eyes against those lights which with proper observation would have led him to knowledge, he must suffer the consequences of his ignorance and be held to have had notice so as to taint his purchase with fraud in law.... The law will not allow him to shut his eyes when his ignorance is to benefit himself at the expense of another, when he would have had them open and inquiring had the consequences of his ignorance been detrimental to himself and advantageous to the other.

*German–American Bank v. Martin,* 277 Ill. 629, 115 N.E. 721 (1917) (quoting *Doyle v. Teas,* 4 Scam. 202). "Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led, and every unusual circumstance is a ground of suspicion and prescribes inquiry.... One having notice of such facts as would put a prudent man on inquiry is chargeable with the knowledge of other facts which he might have discovered on diligent inquiry." *Blake v. Blake,* 260 Ill. 70, 102 N.E. 1007 (1913).

In *German–American Bank v. Martin,* 277 Ill. 629, 115 N.E. 721 (1917), the court found a duty of inquiry to exist where certain tracts of land were in the possession of the record title owner's children, a house had been erected on another tract by one daughter's fiance and used as the marital home, improvements had been made by the children to most of the various tracts, and the father's intention to divide his real estate among his children was common knowledge around the neighborhood and among his business associates. Furthermore, the unrecorded deeds conveying the property to the children had been left in the custody of the subsequent lender in a sealed envelope bearing the father's endorsement that the deeds were being placed in escrow with the bank to be delivered to the grantees upon his death. Upon receipt of this envelope, the bank clerk marked it in red "cannot be withdrawn" as directed and placed it in the vault area. On the basis of these facts, the court found a duty on the part of the bank to inquire as to the interests of the children in the property at the time the bank subsequently took its mortgages, and imputed to the bank such knowledge of those interests as would have been discovered through diligent inquiry of the children and their father.

In *Millikin Trust Co. v. Gregory,* 292 Ill.App. 28, 10 N.E.2d 853 (3d Dist.1937), the court found the alleged possession of the property by the holder of an unrecorded deed was not open, visible, exclusive and unambiguous enough to create a duty of inquiry on the part of a subsequent lender when the evidence was conflicting as to whether such claimant rented the property to a third-party tenant, or whether he had plowed the land himself, and when the grantor lived nearby on other property which was also the subject of the later mortgage. "Any such possession by the defendant was not open, visible, exclusive and unambiguous, such as to not be misunderstood or misconstrued." *Id.* at 35–36, 10 N.E.2d 853.

In *Ehrlich,* 59 B.R. 646 (Bankr.N.D.Ill. 1986), the bankruptcy court was faced with the competing claims of a mortgagee claiming an interest granted by Ehrlich against certain property held in a land trust with Ehrlich as the beneficiary and the claim of Darrell Goldberg, asserting that he was the true owner of the beneficial interest in the property but that Ehrlich had fraudulently induced the conveyance of the property to a land trust naming himself, Ehrlich, as beneficiary without Goldberg's knowledge. The beneficiary actually named in the land trust was Ehrlich and he granted a second

mortgage against the property to Borg–Warner which was recorded. Goldberg argued that the subsequent mortgage was invalid because Borg–Warner had constructive notice, both record and inquiry, of Goldberg's adverse interest and thus Borg–Warner was not a bona fide mortgagee entitled to rely upon Ehrlich's fraudulent chain of title.

Goldberg argued that Borg–Warner had inquiry notice of his interest due to the fact that the property was occupied by a third-party pursuant to a commercial lease. Borg–Warner had previously served a notice of assignment of rents on the tenant so it was clearly aware of the tenant's possession of the premises. The court, however, found that such possession was entirely consistent with the record title of the land trust trustee and would not have aroused any suspicion of Goldberg's interest. The tenant's possession provided constructive notice only of its rights as a tenant and nothing more. Thus, Borg–Warner's failure to inquire of the tenant as to its rights did not result in inquiry notice of another party's adverse interest in the property. *Id.* at 650–51.

*Martin, Millikin* and *Ehrlich* all involved a duty of inquiry based on possession and use of the land. In *Martin,* the court also looked at the common knowledge of the neighborhood and business associates regarding the father's plan to convey the land to his children. While these cases are distinguishable in that neither MorAmerica nor Great American were in possession of the Spruce Lake property, they do provide some insight into the signposts utilized by Illinois courts to find a duty of inquiry.

*Demopoulos* is more closely analogous to the instant case. As discussed above, the *Demopoulos* Court found a duty of inquiry where the defendant contractor directed Demopoulos to the bank to apply for a loan, he participated in the loan negotiations, the amount loaned was based upon his estimates, the contractor called the bank and was told the loan had been accepted before he began working, and the contractor, subcontractor and materialmen were paid by checks issued from the bank pursuant to this loan. 302 Ill.App. at 617, 24 N.E.2d at 173. On the basis of these facts known to the defendant, the court found a duty of inquiry and imputed knowledge of the bank's prior mortgages to the defendant contractor at the time he subsequently took his trust deed. He knew that the parties intended to create a lien against the property as part of the loan transaction and thus he was bound by this actual knowledge to inquire as to the status of the bank's lien prior to taking a subsequent mortgage.

The active involvement of the defendant in the *Demopoulos* loan transaction, however, was greater than the involvement of Great American in securing the release of MorAmerica's equity position. Great American did not actively participate in the negotiation of the release by MorAmerica and was never actually told by the parties that the terms of that agreement included the grant of a mortgage interest to MorAmerica. Although Great American had a copy of the agreement, it never discussed the transaction with MorAmerica and did not discuss the details with Bailey. Furthermore, unlike *Demopoulos,* Great American did not receive any disbursements or any communications at any time from MorAmerica. The factual connections between Great American and the mortgage claimed by MorAmerica are simply not as strong as those in *Demopoulos.*

There are, however, many lesser connections which, when viewed in light of the cumulative facts and circumstances, do suffice to impose a duty of further inquiry upon Great American. The opinion of the district court in *Shacket v. Roger Smith Aircraft Sales, Inc.,* 651 F.Supp. 675 (N.D.Ill.1987), demonstrates the type of cumulative facts needed to place a party on inquiry notice. In *Shacket,* the plaintiffs arranged to purchase an airplane from Roger Smith Aircraft Sales, but they did not obtain or record the proper documents of title, and Smith Aircraft then fraudulently planned to sell the airplane to a third party. In course of this fraudulent scheme, Smith Aircraft borrowed funds from a related entity, Philko Aviation, rep-

resenting to Philko that the money was needed to pay off Smith's seller, Clark Aviation. Smith Aircraft gave title of the airplane to Philko as security for the loan. Philko borrowed the funds from Sandwich State Bank and the money was actually disbursed by the bank to Smith in the form of a check made out to Clark Aviation. The documents of title and a final bill of sale from Smith Aircraft as seller to Philko as buyer were delivered by Smith to the Bank and eventually recorded by the Bank with the FAA. In their suit, the plaintiffs sought a declaratory judgment that they held valid title to the plane as the first purchasers thereof against the seller, Smith Aircraft, the subsequent secured lender/purchaser Philko Aviation and its president, and the third-party lender, Sandwich State Bank.

The issue before the court was whether Philko and its president, McArdle, by virtue of their relationship with Smith and Smith Aircraft, had such knowledge as placed them under an obligation to conduct a reasonable investigation, which in turn would have revealed Shacket's interest in the aircraft. Although transfers of title to an airplane are governed by the Federal Aviation Act of 1958, 49 U.S.C.App. §§ 1301–1542, the court found that the question of 'notice' in state law terms is mirrored in the actual notice exception set forth in § 1403(c) and it therefore jointly addressed the issue of notice under both state law and the federal statute, finding the same standards to be applicable to both. The district court concluded that "actual notice" as used in § 1403(c) includes not only actual knowledge of the unrecorded interest, but also circumstances that should have provoked further inquiry. "Such inquiry notice exists where a person has knowledge of such facts as would lead a fair and prudent person using ordinary care to make further inquiries; and when such inquiry is not made, the person is chargeable with the knowledge that would have been acquired through diligent inquiry." *Id.* (citing *Application of County Collector,* 48 Ill.App.3d 572, 588, 6 Ill.Dec. 415, 426–27, 362 N.E.2d 1335, 1346–47 (1st Dist. 1977)).

Based on all of the facts and circumstances, the court found that (1) Philko had actual knowledge of certain facts, such as knowledge of Smith Aircraft's business and its precarious financial position, which created a duty of further inquiry, (2) that the suspicious nature of the transaction itself should have alerted Philko of the need for further investigation, and (3) that even the most minimal investigation would have uncovered Smith's misrepresentations and fraud. Therefore, Philko was properly charged with actual notice of the Shacket's prior interest. The duty of inquiry imposed upon Philko was based on Philko's knowledge of Smith's financial difficulties, the fact that the amount Smith claimed he needed to purchase the plane was far below the value of the plane, and its related-party dealings with Smith. McArdle was told that the plane was to be sold for nearly twice the amount requested by Smith, and yet he did not question the low purchase price Smith claimed to get from Clark. Furthermore, Smith claimed he needed the money to buy the plane from Clark for resale to Krueger, but he already had in his possession a bill of sale from Clark to Smith which he showed to McArdle. This fact imposed a duty upon McArdle to contact Clark and inquire about the transaction. Furthermore, since Smith Aircraft was under such heavy financial pressure, McArdle should have inquired as to whether any money had already been paid down which could account for the low amount borrowed from McArdle. In light of these facts, the court found the subsequent purchaser to have actual notice of information creating a duty of further inquiry under both state and federal law, and thus the purchaser was properly charged with knowledge of all facts that such an inquiry would have revealed.

Additionally, although not a factor creating a duty of further inquiry, the relative ease with which the purchaser could have made such inquiry also bears upon the reasonableness of the purchaser's conduct in proceeding without further inquiry. At no time prior to entering into this deal with Smith Aircraft did McArdle or Philko at-

tempt to contact Clark Aviation, the purported seller to Smith, Krueger Aviation, the purported contractual buyer from Smith, or the Piper distributor where the plane was allegedly being prepped for delivery. Any one of these simple inquiries would have quickly uncovered Smith's misrepresentations. These matters, individually and collectively, operated to place Philko on inquiry notice. In light of the ease of inquiry and the number of avenues available for such inquiry, Philko's failure to do so was unreasonable and unjustified when it possessed actual knowledge of these suspicious facts. Philko was therefore charged with actual notice of the Shackets' prior interest and that prior interest was valid as against Philko and its president, McArdle.

Applying the same standards to the facts in the instant case, the Court concludes that Great American, the subsequent security-interest holder, had actual notice of facts sufficient to place them under a duty of inquiry regarding the prior interest of MorAmerica. The principles applied in *Shacket* and *Demopoulos* are also applicable here and, in light of the overall facts and circumstances known to Great American, lead to the conclusion that it could have and reasonably should have inquired further as to the terms of the debtor's termination of the equity interests held by the other shareholders and as to the terms of the second mortgage specifically referred to in the April 9, 1986 Agreement.

Great American had actual knowledge of the following facts, which sufficed to place it under a duty of further inquiry. First, Great American had a history of financial dealings with Bailey, the president and a one-third shareholder of the debtor, and it knew that Bailey was undergoing serious financial difficulties. Bailey had repeatedly defaulted on the garden center loan and Great American approached the Cutty's–Gurnee refinancing proposal as a means of paying off the garden center loan. Great American also knew that the debtor was financially troubled and that it needed refinancing to complete the Spruce Lake project and begin profitable operations. Thus, Great American knew that there was little or no possibility that the debtor or Bailey could buy outright the interests held by the other shareholders. This should have alerted it to the probability of some equity to debt restructuring which would more than likely be secured by the property, since this was the only real asset held by the debtor.

Great American also had knowledge of the capital structure of the debtor and the existence of the other two shareholders, Cutty, Inc., and MorAmerica. This information was given to Foster, the loan officer at Great American, and is reflected in his notes of a conversation with Bailey. In addition, both Foster and Ron Hayes, general counsel to Great American, specifically requested copies of all documents relating to the termination of the other equity interests from Bailey and his legal counsel. This was an integral part of the refinancing proposal, since Great American was requesting a pledge of all of the stock in the debtor as security for its loan. Thus, Great American had actual knowledge of the prior existing interests which were terminated as part of its refinancing proposal and it knew that neither Bailey nor the debtor were financially in a position to buy out those interests. These facts should have prompted Great American to inquire as to the terms of the equity interest terminations. Furthermore, as it knew the identity of the parties, it would have been a relatively simple matter to ask either Bailey or MorAmerica about this transaction.

Great American did request copies of the documents relating to the termination of the equity interests of the other shareholders in December of 1986, and was given a copy of the April 9, 1986 Agreement between Bailey, the debtor and MorAmerica. Ron Hayes, general counsel for Great American, testified that he did review the documents forwarded to him from Bailey although he did not specifically recall reviewing the April 9 Agreement. On this basis the parties stipulated that "Hayes reviewed such corporate documents including the April 9 Agreement, before [Great American] made its loan and took a collateral assignment of the beneficial interests

in the land trusts." Great American must therefore be charged with knowledge of its contents and notice of whatever facts were communicated therein.

The third paragraph of the Agreement stated that the debtor and MorAmerica "agree that upon the refinancing of the Gurnee Spruce Lake project [the debtor] will provide [MorAmerica] with a valid second mortgage on the Spruce Lake project." When viewed in connection with the overall circumstances known by Great American, the Court concludes that this language and the related facts were sufficient to place Great American under a duty of further inquiry as to the nature of MorAmerica's mortgage interest before it concluded the refinancing and took the collateral assignment of the beneficial interests. Great American knew that the termination of MorAmerica's equity interest was linked to its own refinancing proposal since it had asked Bailey to reacquire all the stock held in the debtor. Thus, it should reasonably have interpreted the phrase "upon refinancing of the Gurnee Spruce Lake project" to mean upon Great American's refinancing. In fact, Hayes testified at his deposition that he was not concerned with the "second mortgage upon refinancing" clause since he read it to mean that MorAmerica would be second to Great American "because [he] wasn't going to do the transaction otherwise, and this refers to refinancing, which is us." At a minimum, Great American should have inquired as to the intent and meaning of the parties in using this phrase.

Great American cannot argue that it reasonably interpreted the "second mortgage" provision as intended to create an interest subordinate to its own security interest since its original proposal did not provide for any lien against the Spruce Lake property to be given to Great American. The original refinancing proposal formulated by Foster and Bailey in late 1985 required Bailey to pledge 100% of the Cutty's–Gurnee stock and assign the retail installment contracts as security for the transaction. On the basis of this proposal, Bailey and the debtor entered into the April 9 Agreement with MorAmerica. Their intent in so doing was to grant a mortgage interest to MorAmerica which would be second only to Bailey's interest. At that time, neither Bailey nor MorAmerica were aware that Great American was claiming any interest in the Spruce Lake property, much less a first mortgage. It was not until several months later, in late 1986 or early 1987, that Great American first informed Bailey that it would require a collateral assignment of the beneficial interests as security for the refinancing. Thus, it should have been clear to Great American that the second mortgage referred to in the April 9, 1986 Agreement was not intended in any way by the parties to be second to Great American and it reasonably should have inferred that the parties intended MorAmerica's interest to be second to Bailey's prior mortgage. Great American was aware of Bailey's mortgage since this information was reflected in Foster's notes and on the abstract of title reviewed by Hayes. At a minimum, Great American should have inquired of Bailey or MorAmerica as to the parties' intent.

Great American argues that it fulfilled its obligation of inquiry by doing a title search and satisfying all pre-existing liens of record before it took the collateral assignments of the Spruce Lake project land trusts. The fact that Great American conducted a title search and satisfied outstanding liens uncovered thereby does not mitigate the actual knowledge held by it nor does it fulfill its duty of further inquiry regarding the MorAmerica interest. The Court rejects this position and finds that where a party has actual knowledge of an equitable mortgage created by a written, enforceable agreement prior to such party's acquisition of any interest in the property, such party cannot satisfy its duty of inquiry merely by doing a title search, and will be precluded from taking a priority position over the equitable mortgage. As demonstrated in *Shacket, Ehrlich, Martin* and *Millikin,* whether a party is under a duty of inquiry depends upon the facts and circumstances of which such party had actual knowledge and once such a duty arises and is not satisfied, such party is properly

charged with knowledge all of facts which would have been uncovered by a reasonably diligent inquiry. Any such reasonably diligent inquiry here would have revealed the immediate existence of MorAmerica's equitable mortgage interest. Merely because it is an equitable interest, Great American is not entitled to bury its head in the sand or look the other way when it has in its possession the very document creating such interest and knowledge of the circumstances under which it was negotiated.

Great American raises two additional issues in an effort to gain priority over MorAmerica's equitable mortgage: first, that MorAmerica contracted for a second mortgage position and that equity dictates that it be treated as such, and second, that MorAmerica negligently failed to secure a valid written mortgage protecting its rights and thus it cannot now equitably assert a priority position where such negligence caused its current predicament. Great American argues that MorAmerica's demand inequitably asks the court to grant it not the benefit of the bargain it entered into but rather asks the court to do equity by giving MorAmerica more than it bargained for, i.e., by giving it what is in effect a first mortgage.[2]

According to Great American, it is inequitable for the court to enforce an equitable interest so that it provides a recovery different from that originally contracted for especially where such recovery operates to the detriment of another who relied upon obtaining a first priority position. Great American does not cite any authority for this proposition, drawing only on general principles of equity. This Court finds that equity in this matter requires enforcement of MorAmerica's equitable lien and granting it priority over the Great American claim in accordance with the intent of the parties to make the mortgage second only to Bailey's prior mortgage.

The Illinois Appellate Court in *Ready v. Ready*, 300 Ill.App. 42, 20 N.E.2d 636 (2d Dist.1939), held that where a junior mortgage was granted with the intent of making it junior to a specific prior mortgage, such junior mortgage was entitled to a priority position against subsequent lien claimants when the original first mortgage was released even though it was expressly designated as a junior mortgage. In other words, the junior mortgage was only junior to the specific first mortgage contemplated by the parties and was not junior to all mortgages thereafter. The court found:

> It is undisputed that ... the mortgage showed on its face that it was a junior mortgage subject to an indebtedness to the bank and that all parties concerned considered it a junior mortgage for that purpose, but for that purpose alone. It is also uncontradicted that this prior mortgage was paid and released. It seems to us that there is no question but that as soon as this mortgage indebtedness had been paid and released of record, that the mortgage of the complainant would become a first mortgage and lien, and regardless of who were the owners or holders of notes of a later mortgage, they could not have a lien that would be prior to the mortgage in question [since it] was a matter of record which anyone could see.

*Id.* at 51, 20 N.E.2d at 640. The same principle can be applied here—the parties intended that the mortgage interest of MorAmerica be second to Bailey and only to Bailey's prior mortgage. When that mortgage was released, MorAmerica's interest became entitled to a priority position as against those parties with notice thereof. The fact that the mortgage interest is being enforced as a matter of equity rather than law does not change this conclusion. Equitable liens are enforced under the principle that equity will do that which ought to be done and what ought to be done here is that MorAmerica should receive a mort-

---

**2.** If MorAmerica's mortgage interest is valid, it becomes the first mortgage on the property since Bailey released his prior first mortgage in connection with the Great American refinancing. The parties have also stipulated that in the event the MorAmerica interest is given priority over the Great American claim, it will also take priority over the Bailey mortgage, and that the Bailey mortgage is subordinate to the Great American claim.

gage interest, as intended by the parties, which is second to Bailey and only to Bailey's prior mortgage. Equitably, this is what MorAmerica bargained for.

 This position is further supported by a decision of the Illinois Supreme Court which, quoting a leading treatise on Equity Jurisprudence, states the notice rule as follows:

[A] party taking notice of an equity takes subject to that equity. The full meaning of this most just rule is, that a purchaser of an estate or interest, legal or equitable, even for a valuable consideration, with notice of any existing equitable estate, interest, claim or right in or to the same subject matter, held by a third person, is liable in equity to the same extent and in the same manner as the person from whom he made the purchase.

*Rohde v. Rohn,* 232 Ill. 180, 83 N.E. 465 (1908). Under the actual notice rule as stated by the court in *Rohde,* a party with knowledge of an equitable interest is bound by such notice the same as if it were a legal interest. Thus, Great American is bound by its actual notice of MorAmerica's equitable interest, based on its actual knowledge of certain facts and the additional facts it is charged with under the duty of inquiry.

 Great American also argues that MorAmerica was negligent in failing to obtain and record its mortgage and thus, under Illinois law it cannot assert priority where its own negligence caused or contributed to its predicament. To support this position, Great American cites the same two cases, *Rohde v. Rohn,* 232 Ill. 180, 83 N.E. 465 (1908), and *Ready v. Ready,* 300 Ill.App. 42, 20 N.E.2d 636 (2d Dist.1939).

In *Rohde v. Rohn,* the court was faced with the conflicting priorities of two equitable lien claimants, neither of which held an interest enforceable at law since both had been defrauded by their seller into acquiring interests outside the claim of title. When these fraudulent deals were uncovered, the court was faced with the issue of which lien should have priority. Clearly both were enforceable in equity against

Schumacher, but it was not so clear as to which should be allowed to recover first. To resolve this conflict, the court applied the rule that where the equities of the parties are equal, the interest which is prior in time should prevail, but between two equitable mortgages, negligence is sufficient to place the one which is prior in time in a position second to the later interest. In such a situation, the equity of the negligent party is not equal to the non-negligent party. *Id.* at 189, 83 N.E. at 468. "When one only of two equitable encumbrances has been guilty of negligence which has contributed to the situation ..., the party guilty of negligence will be [subordinated] to the other." *Id.* at 189, 83 N.E. at 468. Thus, the court found in favor of the plaintiff.

The instant case is, however, distinguishable from *Rohde.* We are not faced with the competing equitable liens of two claimants where the only claim to priority the court can find is that one party was negligent in not investigating the record. Arguably MorAmerica was negligent in not obtaining a mortgage from the debtor, but the terms of the April 9 Agreement provided that the mortgage would be executed upon refinancing. The parties to the agreement testified that they considered such refinancing to be imminent. When the transaction was still not consummated in August, MorAmerica did obtain a Note evidencing the debtor's obligation although it did not receive a mortgage document. Under the terms of the April 9 Agreement, the mortgage was not yet due for execution so this failure to obtain one does not appear to be negligent. More importantly, however, even if MorAmerica had acted negligently, Great American had actual notice of their interest before it took any rights in the property. Even if MorAmerica negligently failed to adequately protect its interest, Great American cannot now intentionally take advantage of this oversight. "The law will not allow [a purchaser] to shut his eyes when his ignorance is to benefit himself at the expense of another, when he would have had them open and inquiring had the consequences of his ignorance been detrimental to himself and ad-

vantageous to another." *Martin,* 277 Ill. 629, 648–49, 115 N.E. 721 (1917).

Likewise, *Ready,* 300 Ill.App. 42, 20 N.E.2d 636 (2d Dist.1939) does not stand for the proposition that equity dictates priority be given to one party with actual notice of a prior interest simply because the holder of that prior interest negligently failed to fully protect its rights. Rather, in *Ready* the court found that the prior interest was a matter of record and that the subsequent party's failure to check the record resulted in their subordinated position. *Id.* at 53, 20 N.E.2d at 640. This is clearly distinguishable from the position advocated by Great American. Great American argues that although MorAmerica knew that Bailey was seeking refinancing, it chose to do nothing to alert a lender that it claimed an interest in the realty. To the contrary, however, Great American was given, at its own request, a copy of the document under which MorAmerica claims its interest and Great American admits to reviewing this document before it took its interest in that same realty. In light of these facts, Great American is now bound by its notice of the prior interest.

The Court concludes that MorAmerica should prevail under the doctrines of equitable mortgage and inquiry notice. The April 9 Agreement was intended as an immediate binding commitment which was sufficient to create an equitable mortgage which attached to the Spruce Lake property at the time of contracting. Thus, this interest was in existence prior to Great American's receipt of the collateral assignments of the beneficial interests in the land trusts. Furthermore, Great American had actual knowledge of facts which placed it under a duty of further inquiry regarding this interest prior to taking a competing interest. Thus, it is properly charged with knowledge of the facts that such an inquiry would have produced, specifically that MorAmerica claimed a mortgage intended to be second only to Bailey's first mortgage which was to become effective upon the Great American refinancing. If this information had been communicated directly to Great American it could not have escaped

being second to this interest and thus, Great American cannot now claim a priority position over MorAmerica's prior interest. The Court hereby finds that MorAmerica is entitled to a declaratory judgment finding that it holds a secured claim by virtue of its equitable lien which is entitled to priority over the Great American claim. The actual effectuation of this priority in the bankruptcy distribution process shall be made in accordance with the procedures set forth in the following section on equitable subordination.

## COUNT II—MORAMERICA'S COUNTERCLAIM SEEKING EQUITABLE SUBORDINATION OF GREAT AMERICAN'S CLAIM

Alternatively, MorAmerica seeks to have the claim of Great American subordinated to its claim under the doctrine of equitable subordination. This Court finds that fairness in this matter requires subordination to prevent injury to MorAmerica or an unfair advantage to Great American and that subordination of the debt is consistent with other provisions of the Bankruptcy Code. Great American's claim therefore is properly subordinated under § 510(c).

Section 510(c)(1) of the Bankruptcy Code provides that the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest...." The Seventh Circuit has established the following elements to be considered in a § 510(c)(1) equitable subordination claim: (1) whether the creditor claimant has engaged in some sort of inequitable misconduct; (2) whether the misconduct has resulted in injury to other creditors or an unfair advantage to the miscreant; and (3) whether subordination of the debt is consistent with other provisions of the Bankruptcy Code. *Matter of Vitreous Steel Products,* 911 F.2d 1223 (7th Cir.1990). Misconduct by the creditor, however, is not necessarily required in every situation. *Matter of Virtual Network Services Corp.,* 902 F.2d 1246 (7th Cir.1990). An inquiry must be made

on a case-by-case basis, focusing on fairness to the other creditors in light of all the circumstances, to determine whether subordination is appropriate absent creditor misconduct.

■ Applying these principles to the current situation, the Court finds that Great American's claim must be equitably subordinated to the claim of MorAmerica. Great American is not entitled to a priority position over MorAmerica when it had prior notice of MorAmerica's claim. As discussed in the preceding section addressing Count I, under the circumstances Great American is properly charged with notice of the MorAmerica claim and was under a duty to inquire further as to its status. These circumstances also dictate that the claim of Great American be equitably subordinated to that of MorAmerica. Whether Great American had actual knowledge which it intentionally chose to ignore or was merely negligent in failing to inquire as to the status of MorAmerica's claim, the conclusion of this Court is the same. An actual finding of affirmative creditor misconduct is not required. Equity dictates that negligence or the failure to act may also constitute grounds for subordination of the Great American claim. Great American is properly charged with inquiry notice of the MorAmerica claim and its failure to investigate and efforts to take priority despite such notice provide grounds for equitable subordination.

The Seventh Circuit Court of Appeals recently held in *Kham & Nate's Shoes v. First Bank of Whiting*, 908 F.2d 1351 (1990), that the decision of a creditor-bank to discontinue post-petition financing in accordance with the terms of its contract did not constitute inequitable conduct requiring subordination even though the lack of financing severely impaired the debtor's ability to reorganize. The Court found no misconduct since the Bank did not create the debtor's need for funds, nor was it contractually obligated to satisfy its customer's desires. The Bank was entitled to advance its own interests and need not put the interests of the debtor and debtor's other creditors first. Likewise, Great American was not obligated to undertake the refinancing with the debtor and a mere refusal to extend additional financing to the debtor would not be grounds for equitable subordination. Great American, however, could not ignore the interests of the other parties and attempt to take a priority lien position through the refinancing despite its notice of adverse claims. When Great American sought to negotiate an alternative refinancing proposal calling for the collateral assignment of the beneficial interests, it was under a duty to inquire as to the April 9 Agreement and MorAmerica's position. It was this failure to do so which constitutes grounds for equitable subordination of its claim, not the decision to negotiate alternative refinancing terms.

The second requirement for equitable subordination is also present here in that Great American has obtained a benefit at MorAmerica's expense. Equitable subordination requires that the subordinated creditor's conduct result in injury to other creditors or an unfair advantage to such creditor. MorAmerica held an equitable lien prior to the Great American loan which was to be finalized by the grant of a formal, written mortgage at the time of the Great American loan. MorAmerica, however, did not receive an actual mortgage and was unable to perfect its position since Great American decided to take a collateral assignment of the beneficial interests, and caused the land trustees not to record any other claims against the land trusts. Great American's actions have resulted in MorAmerica's loss of status as a secured creditor with a perfected claim and in Great American receiving a first priority claim despite being on notice as to adverse claims. Assuming there are inadequate funds in the estate to pay all secured creditors or, in the event the equitable lien of MorAmerica is avoided by the trustee, to pay all unsecured claims in full, then MorAmerica will have suffered a real and quantifiable injury. Under these circumstances, Great American's claim is properly subordinated to the claim of MorAmerica.

Such equitable subordination is not inconsistent with other provisions of the

Bankruptcy Code. The purpose of the Code and of § 510(c) specifically is to ensure a fair and equitable distribution among creditors. Subordinating the claim of Great American to that of MorAmerica produces such an equitable result. Great American argues, however, that an equitable lien cannot be given priority in bankruptcy at the expense of the unsecured creditors when the equitable lien creditor failed to take steps to perfect and protect its own interests. According to Great American, MorAmerica's failure to correctly discern the identity of the land trustees as the owners of record, the fact that it did not obtain a proper mortgage from these owners and that it did nothing to alert other lenders that it claimed an interest in the realty all operate to preclude MorAmerica from taking a priority position in the bankruptcy proceedings. To support this position, Great American relies upon *In re Hendleman,* 91 B.R. 475 (Bankr. N.D.Ill.1988) (Barliant, J.).

The issue in *Hendleman* was whether the creditor held an equitable lien which should be treated as a secured claim in the debtor's bankruptcy proceedings and which would effectively result in the unsecured creditors receiving nothing. The equitable lien in issue was intended as a second mortgage, was evidenced by a promissory note and was intended to be secured by an assignment of the beneficial interest in a land trust covering the debtor's home, but the debtor failed to actually deed the property to the land trust. The court held that although an equitable lien did exist under Illinois law, it could not be given effect in the bankruptcy distribution. *Id.* at 476.

The debtor's confirmed Chapter 13 plan proposed to pay both the equitable mortgagee, as a secured creditor, and the unsecured creditors from the proceeds of the sale of the property. Upon sale of the property, however, the amount realized fell below the amount needed to consummate the confirmed plan. The debtor therefore sought to modify the plan on the grounds that treating the equitable lien claim as an unsecured claim would be in the best interests of creditors as required under § 1325(a)(3). The best interest of creditors

test requires the plan to offer unsecured creditors payment with a present value equal to the liquidation distribution they would receive in a Chapter 7. The court concluded that since the equitable lien could, and therefore would, be avoided by a Chapter 7 trustee, enforcement of such a lien in a Chapter 13 proceeding would not be in the best interest of creditors.

The court stated that an equitable lien is by definition unperfected and subject to avoidance by the trustee pursuant to his strong arms powers granting him the status of a judicial lien creditor or bona fide purchaser, so that a judicial lien can never survive an attack by a Chapter 7 trustee. *Id.* Furthermore, the court concluded that equitable liens are to be treated with disfavor under bankruptcy law since a creditor who failed to perfect a security interest should not receive priority at the expense of other creditors who had no notice of that interest. The court characterized the issue as a dispute between the equitable lien claimant and the general unsecured creditors and found "nothing equitable about taking money away from unsecured creditors and giving it to a creditor that failed to protect its own interests when it had a chance to do so." Thus, the equitable lien claim was allowed only as an unsecured claim and the debtor's Chapter 13 plan was modified accordingly.

Great American relies on *Hendleman* for the position that MorAmerica cannot be given a priority claim due to its failure to perfect its equitable lien. To the extent that MorAmerica seeks to prevail over unsecured creditors, this Court agrees. Although MorAmerica has an equitable lien enforceable under Illinois law, this interest would likely be avoidable by the Chapter 7 trustee under § 547 since it was not perfected under state law prior to bankruptcy filing. The trustee's avoidance powers are not self-executing, however, and the trustee has not brought any such avoidance action. Bankr.Rule 7001; *In re Walls,* 17 B.R. 701 (Bankr.S.D.W.Va.1982); *In re Tackett,* 21 B.R. 107 (Bankr. D.N.M.1982). Nor can the trustee's avoidance powers be exercised by creditors. *Sa-*

*line State Bank v. Mahloch,* 834 F.2d 690, 695 (8th Cir.1987); *In re Commercial Finance Corp.,* 761 F.2d 1329, 1338 (9th Cir. 1985). Thus, MorAmerica's claim is secured by an equitable lien unless and until such time as the Chapter 7 trustee successfully has it avoided. At that point, the claim would become a general unsecured claim even though the equitable lien would be enforceable under state law in a non-bankruptcy context.

This argument, however, does not address the real issue of equitable subordination of Great American's claim to the claim of MorAmerica. Great American argues that an equitable lien should not be given priority where the equitable mortgagee did nothing to alert other lenders that it claimed an interest, thereby failing to protect its own rights. This position ignores that fact that, unlike the unsecured creditors in *Hendleman,* Great American was alerted to the MorAmerica claim and had in its possession the document creating the equitable lien. In this situation the dispute is not between unsecured creditors and an equitable lien claimant, but rather is a dispute involving a secured lender with prior notice of the equitable lien claim. Subordination in this context is proper.

 The actual implementation of the subordination, however, must be carefully structured to avoid impairment of other creditors. The underlying basis of the equitable subordination here is Great American's inquiry notice as to the MorAmerica equitable mortgage. This mortgage is only enforceable against parties who acquired a later interest with notice of its existence, i.e., only against Great American. The enforcement cannot take the form of a holding that MorAmerica is entitled to a first priority equitable lien against the real estate which shall be paid as an allowed secured claim before distribution to other secured creditors since the lien is not enforceable against such other creditors. Nor could the equitable lien be enforced against unsecured creditors if avoided by the trustee. Thus, to protect the competing claimants, it is necessary to carefully implement the equitable subordination of Great American's claim.[3] The fact that MorAmerica may ultimately hold an unsecured claim does not preclude subordination of a secured claim to this claim. Section 510(c) provides for subordination of one allowed claim to another or one allowed interest to another. Thus, Great American's claim can be subordinated to that of MorAmerica, regardless of MorAmerica's secured or unsecured status. Practically speaking, MorAmerica will "step into" the secured shoes of Great American to the extent of its claim and Great American will "step into" the equitable lien shoes of MorAmerica to the extent of its allowed claim, with the resulting subordination to other creditors. The procedural mechanisms for enforcing the subordination in the bankruptcy distribution scheme are more fully set forth herein at the end of this section of the Memorandum Opinion.

It may appear a harsh remedy to remove Great American's first priority of record, but when such position was obtained by deliberate disregard of the April 9 Agreement, it is not inequitable to place Great American in the position it would have been in if the MorAmerica mortgage had been fully concluded. If the April 9 Agreement had been fully honored, Great American's interest in the real estate, if any, would have been subject to MorAmerica's prior interest. Due to its actions in unilaterally altering the terms of the refinancing to require the collateral assignments directing the land trustees not to record any additional interests despite its notice of MorAmerica's claim, Great American has prevented MorAmerica from perfecting its

---

**3.** Although the issue is not before the Court at this time, assuming the trustee obtained avoidance of the equitable lien of MorAmerica, the unsecured claim of MorAmerica could not simply be allowed in front of or prior to Great American without injuring the unsecured creditors. In that event, equitable subordination would seem to require a switch of the relative unsecured and secured positions of MorAmerica and Great American. No such avoidance has been undertaken at this time, however, so the "switch" occurs within the secured creditors group, and MorAmerica will receive the first priority ranking of Great American. Great American, in turn, will receive the last secured priority ranking of MorAmerica's equitable lien.

claim and receiving secured creditor status. Great American then is properly relegated to this same position. This Court orders that, to the extent of MorAmerica's allowed claim, the claim of Great American shall be subordinated to the claim of MorAmerica and will be treated a claim holding whatever priority position is held by MorAmerica.

■ Before reaching the procedural aspects of subordination, however, the Court must also address Great American's claim for equitable subrogation. The Court finds that Great American is entitled to be subrogated to the rights of the prior lien holders in the amount of $500,000 paid from the loan proceeds. As part of the ultimate refinancing deal, Great American paid off certain liens held by Greyhound Leasing and one or two other claimants against the Spruce Lake property. These were the "newly discovered" liens which led to the modification of the original loan proposal in late 1986 or early 1987. The evidence in the record regarding the amounts, identity of the lienholders and the underlying basis of the claim is sketchy and incomplete, leaving the Court unable to absolutely determine the extent of Great American's payments. It is stipulated by the parties, however, that liens in excess of $500,000 were satisfied and that some loan proceeds were used to pay contractors upon completion of the Spruce Lake project. No other evidence has been submitted which would allow this Court to make an exact finding of the amounts or recipients of such payments. The Court therefore adopts the stipulated amount of $500,000 and finds that Great American is entitled under the doctrine of subrogation to assert the claims and priorities of those prior liens in this bankruptcy proceeding.

The instant facts are analogous to those in *Detroit Steel Products Co. v. Hudes*, 17 Ill.App.2d 514, 151 N.E.2d 136 (1st Dist. 1958), relied upon by Great American. In *Detroit Steel*, the court was faced with the competing lien claims of a bank/mortgagee, which had paid off several mechanics lien or materialmen claimants in acquiring what it thought was a first priority mortgage, and the claims of subsequent mechanics lien and materialmen claimants. The evidence established that the liens were paid out of the loan proceeds with the intended purpose of placing the bank in a first priority position. Under the Mechanics Lien Act of Illinois, however, it was clear that the remaining mechanics liens had statutory priority over all other claims. The issue then became whether the bank was entitled to assert the equal priority rights of the mechanics liens paid from the loan proceeds under a doctrine of equitable subrogation so that it would share in the first priority distribution. The court stated that "subrogation will be granted only where an equitable result will be reached [and] can be applied only with a due regard to the legal and equitable rights of others." *Id.* at 521, 151 N.E.2d at 139. "Equity seeks by subrogation to prevent the unearned enrichment of one party at the expense of another, by creating a relation somewhat analogous to a constructive trust in favor of the subrogee, or party making payment, in all legal rights held by the creditor." Equitable subrogation therefore can only be invoked where the position of the junior lender has not been changed in reliance upon the release of the first mortgage. *Home Savings Bank v. Bierstadt*, 168 Ill. 618, 48 N.E. 161 (1897).

The rule of equitable subrogation is intended to ensure that a junior lienholder does not benefit unjustly to the detriment of the new lender from the payoff of the prior first lien through new secured financing. In such a situation it would be patently unfair to advance what was clearly a junior lien claim to a first priority status simply because the original first priority lien was replaced by a new lender which intended to take first priority, but whose lien actually arose after the junior lien was already in existence. This reasoning was applied in *Tyrell v. Ward*, 102 Ill. 29 (1882), to subrogate the lien of a mortgage lender to the first priority status of the existing liens which were paid off at the time of the loan. Since the judgment lien creditor could not have obtained priority over the prior existing liens, the court reasoned that it would be inequitable to now advance such judgment lien over the mortgagee

which satisfied prior claims with the intent of assuming a first priority position. The transaction represented a mere change in form which should be treated as an assignment of the prior liens. *Id.* at 37–38.

The facts here are distinguishable from *Bouton v. Cameron*, 205 Ill. 50, 68 N.E. 800 (1903), where the Illinois Supreme Court found no express or implied agreement for subrogation since the subsequent lender did not even review the documents authorizing the pledge of certain collateral to the prior creditor at the time it advanced the funds used to pay off the prior debt, only briefly reviewed the subsequent release of the prior security interest, and then returned the documents to the borrower. *Id.* at 66, 68 N.E. at 806. Under these facts the court found the subsequent lender to be a mere volunteer for the purpose of paying off the prior creditor and held that such a business transaction does not entitle him to subrogation to the prior lien claim.

Furthermore, MorAmerica cannot argue that GreatAmerican is somehow estopped from subrogation due to its prior notice of MorAmerica's claim. In *Kaminskas v. Cepauskis*, 369 Ill. 566, 17 N.E.2d 558 (1938), the Illinois Supreme Court held that subrogation was necessary to ensure that the lender received the benefit of the security he has been promised and thus it granted him priority over the dower claim of the debtor's widow. The court expressly stated that although the evidence did not support the contention of knowledge, it was of the opinion that "the question of knowledge is immaterial as far as the principle of [equitable] subrogation is concerned." *Id.* at 571, 17 N.E.2d at 561.

The Court finds that equitable subrogation is proper here to allow Great American to succeed to the priority position previously held by Greyhound Leasing and the other lien claims it satisfied. It appears that Bailey intended Great American to take a first priority lien against the real estate, despite his prior agreement to grant a second mortgage to MorAmerica which would be second only to Bailey's existing mortgage. While this conduct would certainly prevent Bailey or the debtor from seeking subrogation, the breach of the April 9 Agreement does not justify placing MorAmerica in a priority position over the pre-existing liens of record and effectively granting it a windfall. It is stipulated by the parties that liens in excess of $500,000 were satisfied by Great American pursuant to the refinancing with the intent of taking a first priority position against the real estate. The mortgage of MorAmerica would have been subject to such liens if they had not been satisfied by Great America. Even assuming the April 9 agreement had not been breached and MorAmerica had received an actual mortgage, such interest would be subject to prior liens of record. Those liens have only been released by virtue of Great American's refinancing and the parties intended to grant a first priority position to Great American in connection with that refinancing. There was an implied agreement in this intent that the prior liens would be extended to Great American as security for its satisfaction of the claims. The fact that Great American had knowledge of MorAmerica's claim does not negate this intent. As stated by the Illinois Supreme Court in *Kaminskas*, knowledge is immaterial as far as subrogation is concerned. Subrogation is allowed because the junior lien holder, MorAmerica, is not prejudiced by allowing the new lender, Great American, to claim the priority of the original lien holder since the junior claimant was subject to that interest anyway. The release of the prior liens was merely a change in form with the intent of substituting the security interest of Great American for the prior liens it satisfied. This situation is indistinguishable from those cases where a junior lien was taken with full knowledge of the first priority mortgage and a new lender has merely been substituted into that position with no change in the junior lender's position. The equities here dictate that the claim of Great American be subrogated to the relative priority positions held by the approximately $500,000 in liens it has previously paid. Under these circumstances, although the Court finds that the claim of Great American is properly subordinated to

the interest of MorAmerica, it also finds that Great American is entitled to equitable subrogation to the rights of other lien claims it may have satisfied prior to taking such claim.

■ Having made such findings, the Court turns now to the mechanics of implementing the equitable subordination and equitable subrogation of the various claims. Assuming there are inadequate funds in the estate to fully satisfy all creditors, it is necessary to protect the competing secured and unsecured claimants by establishing a hierarchy of distribution which reflects the subordination of a portion of the Great American claim to Mor-America's equitable lien claim and which allows for the subrogation of a portion of the Great American claim to the relative priority positions held by the liens it previously satisfied. This process consists of the following four steps: (1) determining the relative priority of the allowed claims of the parties to this proceeding before application of the subordination and subrogation holdings made herein; (2) bifurcation of the allowed claim of Great American into three parts—the subordinated amount, the non-subordinated amount and the subrogated priority amount; (3) attaching to the subrogated amount of the Great American claim the priority position that would have been held by the prior liens satisfied by Great American if such claims had not been previously paid off; and (4) applying the doctrine of equitable subordination to substitute the subordinated amount of the Great American claim for the MorAmerica claim, with the subordinated claim ultimately found to be secured or unsecured based on the trustee's success in avoiding the MorAmerica lien.

In assessing the pre-subordination and pre-subrogation priorities of these parties, the Court is not determining the relative positions of any other secured claimants

and these conclusions are valid only for purposes of the priority rankings among the parties directly involved herein. The parties hereto each timely filed a secured proof of claim, Great American in the amount of $2,323,346.00 plus interest, attorneys fees and costs, and MorAmerica in the amount of $447,200.00 plus interest, fees and costs, and the priority determinations herein are based on these proofs of claims. As discussed in this Court's Opinion, Great American holds a valid secured interest in the amount of its allowed claim in the proceeds of the sale of the Spruce Lake property based on the collateral assignments of the beneficial interests which it held and such interest appears to hold first priority among the parties herein prior to the subordination of its claim. MorAmerica would necessarily hold the last priority secured claim since its equitable lien cannot be enforced against any secured creditor without notice.[4] In the event the MorAmerica lien is avoided by the trustee its position will be changed to that of an unsecured creditor but no such avoidance has been effected at this time. The Court again notes that there may be other secured creditors with priority positions in between or above the positions accorded to Great American and MorAmerica herein and the conclusions made herein do not alter these positions.

Having determined the priority positions prior to subordination and subrogation, it now becomes necessary to divide the Great American claim into three portions based upon the treatment to be accorded to it. The portion of the claim to be subordinated to MorAmerica's interest shall be designated the "subordinated amount" and shall be equal to the allowed claim of MorAmerica based on its proof of claim. Similarly, the portion of the claim entitled to be subrogated to the rights of the previously satisfied lien claims shall be designated as the "sub-

---

4. It has been stipulated by the parties that in the event the Court finds MorAmerica to be entitled to priority over Great American, the mortgage claim of Bailey, if any remains, will also be treated as subordinate to the MorAmerica claim. It has also been stipulated by the parties that Bailey has released his first mortgage and that such mortgage would be subordinated to the Great American claim in any event. The Court has not provided for the impact, if any, of these stipulations in its ruling since there has been no evidence that Bailey holds any secured interest which would be entitled to a dividend in the bankruptcy estate.

rogated amount" and shall be equal to the stipulated liens in the amount of $500,000. The remaining balance of the Great American allowed claim as set forth in its proof of claim shall be designated the "non-subordinated/non-subrogated amount."

The next step is to apply the Court's finding that the subrogated amount of Great American claim is entitled to succeed to the rights and priority positions held by the various underlying liens before they were satisfied by Great American. It appears from the testimony and from the stipulations that such liens in excess of $500,000 were a matter of record prior to the 1987 Great American refinancing and that such liens held a first priority position at that time. Whatever position was held by such lien claimants, Great American is now entitled to assert such position and receive distributions in this bankruptcy proceeding the same as would have been received by such lien holders in the subrogated amount of its claim. Assuming such liens would be entitled to a first priority distribution of the sales proceeds, this amount shall be paid to Great American before any payments are distributed to MorAmerica.

The Court must then apply its finding that the allowed secured claim of MorAmerica evidenced by its proof of claim is entitled to priority over the subordinated amount of the Great American claim. This subordination shall be effected by giving the MorAmerica allowed claim the priority and relative distribution position held by Great American. To the extent that there are other secured claims against the proceeds of the Spruce Lake property which are not involved in this proceeding and which hold a superior position to that of Great American, such claims shall be satisfied before any distribution is made to MorAmerica. After any such superior claims have been paid, MorAmerica will assume the priority position which would have been accorded to the subordinated amount of the Great American claim and will be paid from the remaining sale proceeds. MorAmerica

will effectively step into the shoes of Great American to the extent of the subordinated amount of the Great American claim. This amount shall be paid to MorAmerica from the proceeds of the sale of the property prior to payment of the non-subordinated Great American claim. Following the payment of the subrogated amount and the MorAmerica claim, the remaining non-subordinated/non-subrogated amount of the Great American claim shall then be paid from any remaining sale proceeds.

The subordinated amount of the Great American claim shall be accorded the priority position ultimately attributed to MorAmerica's equitable lien. The subordinated amount of the Great American claim effectively steps into the shoes of the MorAmerica claim. Assuming no avoidance is undertaken by the trustee, the MorAmerica claim will hold a last priority secured position (without considering the stipulations of the parties) and it is this position into which Great American's subordinated claim is placed. The subordinated claim is thus entitled to be satisfied from any remaining sale proceeds after payment of all other superior secured claims in the manner discussed above.[5]

The Court hereby finds that MorAmerica is entitled to have the claim of Great American equitably subordinated to its claim. The Great American claim, however, is also entitled to be subrogated to the interest of the lienholders previously satisfied by it. The implementation of these findings shall be undertaken in accordance with the Court's discussion herein.

## COUNT III—MORAMERICA'S COUNTERCLAIM SEEKING DAMAGES FOR TORTIOUS INTERFERENCE WITH ITS CONTRACTUAL RELATIONS

■ Alternatively, MorAmerica argues that it is entitled to an award of damages in the amount of its allowed claim against Great American on the grounds that Great American tortiously interfered with its contractual agreement with the debtor. Under Illinois law, the elements of a claim for

---

**5.** In the event the trustee avoids the MorAmerica lien, Great American's subordinated claim would similarly assume the unsecured creditor status of MorAmerica and be paid accordingly.

tortious interference with contractual relations are as follows:

(1) the existence of a valid and enforceable contract between plaintiff and another party;

(2) defendant's knowledge of the existing contract;

(3) an intentional and malicious inducement of a breach by defendant;

(4) a subsequent breach by the other party to the contract; and

(5) damages to the plaintiff.

*Amalgamated Fin. Corp. v. Atlantic, Inc.*, 105 Ill.App.3d 379, 61 Ill.Dec. 264, 434 N.E.2d 417 (1st Dist.1982); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254 (7th Cir.1990). Applying these standards to the instant matter, the Court finds that Great American has tortiously interfered with the contractual relations of MorAmerica and the debtor, Cutty's–Gurnee.

■■■ The first element of tortious interference is the existence of a valid and enforceable contract. The April 9, 1986 Agreement between MorAmerica, Cutty's–Gurnee and Bailey clearly satisfies this requirement. The Agreement is duly executed and was intended by the parties to be binding and effective upon signature. Cutty's–Gurnee and Bailey contractually bound themselves to convey a second mortgage to MorAmerica upon refinancing of the Spruce Lake property. This obligation was immediately binding, with performance due upon the occurrence of a specified future event. Although the language may not include the particulars of the future refinancing, the parties to the agreement intended to refer to the Great American refinancing proposal being negotiated at that time and there was a meeting of the minds on this point. No party to this proceeding has raised any objection to the validity of this agreement. Rather, the contested issues focus on the effect of the April 9 Agreement upon Great American's claim under the collateral assignments of the beneficial interests in the land trusts.

Having established that a valid and enforceable contract exists, it is also necessary to find that the defendant, Great American, had knowledge of the contract's existence. As discussed in the preceding sections of this Memorandum Opinion, copies of the April 9 Agreement, along with other documents relating to the termination of the other equity interests in the debtor, were delivered to Great American and reviewed by its legal counsel prior to the Great American loan in 1987. Having stipulated that it reviewed the text of the April 9 Agreement, Great American cannot now argue that it was unaware of the terms or the existence of such contract. To the extent that such terms may have been ambiguous or that the rights allegedly interfered with were not plainly set out in such contract, this Court deems these factors to pertain to the intentional and malicious nature of Great America's conduct rather than their knowledge of its existence.

■■■ The third element requires proof that the defendant intentionally and maliciously induced the contracting party to breach its agreement. Under this standard it is not necessary to establish that the defendant acted with ill will, hostility or an intent to injure. It is only necessary to show that it acted intentionally and without just cause. *Amalgamated Fin. Corp. v. Atlantis, Inc.*, 105 Ill.App.3d 379, 61 Ill. Dec. 264, 434 N.E.2d 417 (1st Dist.1982). *Fuller v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326 (7th Cir.1983). "Intentional conduct which brings about the breach with knowledge of the relationship is all that is required." *Waldinger Corp. v. C.R.S. Group Engineers, Inc.*, 775 F.2d 781, 789 (7th Cir.1985) (quoting lower court opinion).

Applying this standard to the conduct of Great American, the Court finds that it intentionally induced Bailey and the debtor, Cutty's–Gurnee, to breach the April 9 Agreement. Great American entered into the 1987 refinancing agreement with the intent to obtain a first priority lien against the Spruce Lake property. It intentionally required Bailey to release his first mortgage and execute the collateral assignments of the beneficial interests, which precluded the recordation of any other interests, to achieve such a priority position.

Furthermore, Great American expressly refused to extend any additional financing if these terms were not accepted. Through these actions, Great American intentionally altered the loan proposal previously discussed with Bailey and Cutty's–Gurnee and required Bailey and the debtor to grant it a secured position which necessarily precluded them from fulfilling their obligations to MorAmerica. Cutty's–Gurnee and Bailey could not convey a valid second mortgage to MorAmerica if the beneficial interests had been assigned to Great American and the land trustees directed not to record any additional claims against the land trust property. Great American had not previously expressed any intention to take a security interest in the Spruce Lake property since it sought a pledge of 100% of the Cutty's–Gurnee stock and a security interest in the retail installment contracts. After it received the documents evidencing the release of the existing claims against that collateral, however, Great American altered its position and required Bailey and Cutty's–Gurnee to grant it a security interest in the Spruce Lake property also. Great American intentionally made its refinancing contingent upon these terms even though it had in its possession the contract obligating Cutty's–Gurnee and Bailey to grant a valid second mortgage to MorAmerica in exchange for MorAmerica's release of the stock and installment contracts. Thus, Great American intentionally induced Bailey and Cutty's–Gurnee to breach the April 9 Agreement by requiring that it be given a first priority security interest against the land trusts to obtain the refinancing.

■ Furthermore, such action was taken without just cause. Although there is a general duty not to interfere with the contractual relations of others, justification for intentional interference exists when the party acts to protect a conflicting interest which is considered to be of equal or greater value than that accorded to the contractual rights involved. *Waldinger Corp. v. C.R.S. Group Engineers, Inc.*, 775 F.2d 781 (7th Cir.1985). For example, such a conditional privilege exists for an attorney interfering in a contract involving his client, for a corporate officer interfering in the contract of his corporation, and for an architect interfering in the construction contract of his principal. Such interference will not be deemed tortious unless it is undertaken to further the agent's personal goals or to injure the other contracting party, rather than to protect the principal's best interests. *Id.* at 790. Clearly there is no such fiduciary relationship between Great American and Cutty's–Gurnee which would create a conditional privilege allowing Great American to protect the best interests of Cutty's–Gurnee by interfering in its contractual relationships.

■ The only motivation for Great American's actions, then, is the protection of its own economic self-interests. Such a motivation is insufficient to justify interference in the contractual relationship of another. "To hold otherwise would amount to holding that any interference with a contractual relationship is justified so long as it is beneficial to the interfering party. Such a result cannot be proper." *Gorman Pub. Co. v. Stillman*, 516 F.Supp. 98, 106 (N.D.Ill.1980). The defendant must show something more than its own economic self-interest to justify the inducement of a breach of contract. *Amalgamated Fin. Corp. v. Atlantic, Inc.*, 105 Ill.App.3d 379, 382, 61 Ill.Dec. 264, 434 N.E.2d 417 (1st Dist.1982).

The fourth element requires that a subsequent breach actually occur. In this case the April 9 Agreement has been breached since Bailey and Cutty's–Gurnee have not conveyed a valid mortgage, second only to Bailey's prior mortgage, to MorAmerica even though the refinancing has been completed. The Agreement was breached when the collateral assignments were given since this removed Bailey's and the debtor's power of direction of the land trusts and necessarily precluded execution of a valid mortgage in favor of MorAmerica.

Lastly, MorAmerica must prove that is has incurred damages as a result of the breach. If the contract had been fully performed, the claims of Greyhound Leasing would have been satisfied and MorAmerica

would have received a valid mortgage intended to be second only to the existing mortgage of Bailey. As a result of the breach, however, MorAmerica holds only an unsecured promissory note given by the debtor and an equitable lien against the Spruce Lake property. Assuming there are insufficient funds to pay all secured creditors or that the lien is avoided and there are insufficient funds to pay unsecured creditors in full, then MorAmerica will incur a loss of security in the amount of the note, the related interest and the costs of collection. Such damages are properly assessed against Great American for its intentional inducement of the breach. As an alternative remedy to the relief granted under Count I and Count II of the Counterclaim, the Court finds an award of damages to be appropriate.

The Court hereby finds that MorAmerica is entitled to judgment in its favor awarding it damages against Great American in the unsatisfied amount of MorAmerica's allowed claim in the event the MorAmerica allowed claim is not paid in full from the debtor's bankruptcy estate.

## COUNT IV—MORAMERICA'S COUNTERCLAIM SEEKING DAMAGES FOR BREACH OF UCC § 1–203 OBLIGATION OF CONTRACTUAL GOOD FAITH

MorAmerica alternatively asserts that Great American owed a duty to MorAmerica pursuant to § 1–203 of the Uniform Commercial Code to perform and enforce in good faith the duties arising from the Cutty's–Gurnee loan agreement and the April 9 Agreement and that Great American breached these duties by refusing and failing to exercise its control over the land trustees to recognize the MorAmerica equitable mortgage. MorAmerica did not move for summary judgment on this Count and it is not briefed by either party in their respective submissions. The Court hereby finds that MorAmerica is not entitled to prevail under this Count and orders that judgment be issued in favor of Great American and against MorAmerica for the following reasons. First, the Court is not convinced that the provisions of the Uniform Commercial Code are applicable to

the transactions involved in the April 9th Agreement. Second, MorAmerica has not demonstrated any duty of Great American arising from the loan agreement or collateral assignment of the beneficial interests which extends to MorAmerica and would grant it standing to bring an action for breach thereof. The relief requested in Count V is denied.

### JUDGMENT ORDER

This action came to be heard before the Honorable Erwin I. Katz, Bankruptcy Judge presiding, on the complaint of Great American Insurance Company ("Great American") to determine the validity, extent and priority of liens claimed by various defendants, including MorAmerica Capital Corporation ("MorAmerica"), and on the counterclaim of MorAmerica against Great American. The Court, having reviewed all the evidence, being fully advised of the premises and having directed entry of a final judgment,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that for the reasons set forth in the Court's Memorandum Opinion dated August 7, 1991, final judgment is entered as follows declaring the validity, priority and extent of the MorAmerica and Great American claims against the debtor, Cutty's–Gurnee, Inc.:

1. MorAmerica holds a valid, secured claim against the debtor in the amount of $447,200 plus interest, attorneys fees and costs as provided for in the note and mortgage underlying its claim. MorAmerica's claim is secured by its equitable lien against the Spruce Lake property;

2. Great American holds a valid, secured claim against the debtor in the amount of $2,323,346 plus interest, attorneys fees and costs. Great American's claim is secured by a collateral assignment of the beneficial interest in the Spruce Lake property land trusts;

3. MorAmerica's secured claim takes priority over Great American's secured claim. Alternatively, Great American's secured claim is equitably subordinated to the extent of MorAmerica's secured claim pursuant to 11 U.S.C. § 510(c). In either

case, the MorAmerica secured claim shall be paid in full from the proceeds of the sale of the Spruce Lake property prior to any payment from such proceeds of the Great American secured claim, subject to the rights of Great American set forth in paragraph 4 below;

4. Great American is subrogated in the amount of $500,000 to the rights of those lien claimants on the Spruce Lake property title record which Great American paid prior to the 1987 refinancing of the debtor;

5. MorAmerica is entitled to a money judgment in its favor and against Great American awarding MorAmerica damages against Great American in the unsatisfied amount of MorAmerica's claim in the event the MorAmerica's claim is not paid in full from the debtor's bankruptcy estate;

6. MorAmerica's additional defense that Great American breached its duty of good faith pursuant to U.C.C. § 1–203 is denied; and

7. This is a core proceeding pursuant to 28 U.S.C. § 1334(b) and 11 U.S.C. § 157(b)(2)(A), (B), (K) and (O). This is a final order within the meaning of 28 U.S.C. § 158.